### In re MOFFITT, ZWERLING & KEMLER, P.C.

No. 93–0006–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Feb. 22, 1994.

464

This is the general and quite significant question presented in this 21 U.S.C. § 853(n) criminal forfeiture proceeding. In essence, William Covington ("Covington"), facing indictment for various drug trafficking offenses, paid the law firm of Moffitt, Zwerling and Kemler, P.C. ("the Law Firm") $103,800 to retain the services of its experienced and well-known criminal defense lawyers. Thereafter, Covington was indicted and subsequently pled guilty to several drug trafficking offenses. Pursuant to the plea agreement, the Court entered an order forfeiting various properties Covington admitted were derived from his drug trafficking activities. These properties included certain real property, Covington's auto service business, various firearms and cash, including the cash paid to the Law Firm. Seeking to defeat forfeiture of its fee, the Law Firm filed a petition pursuant to 21 U.S.C. § 853(n)(2), claiming that it was, in effect, a bona fide purchaser for value of the fee and that at the time the fee was received, the Law Firm was "reasonably without cause to believe that the property [i.e., the cash fee] was subject to [criminal] forfeiture...." 21 U.S.C. § 853(n)(6)(B). This Memorandum Opinion considers and disposes of the issues raised by the Law Firm's petition.

Helen Fahey, U.S. Atty., Jay Apperson, Gordon D. Kromberg, Asst. U.S. Attys., Alexandria, VA, for plaintiff.

Arthur F. Mathews, James Lee Buck, II, Craig M. Blackwell, Wilmer, Cutler & Pickering, Washington, DC, for defendant.

## MEMORANDUM OPINION [1]

ELLIS, District Judge.

### I.

Under what circumstances are the fees paid to an attorney by an accused drug trafficker subject to criminal forfeiture?

### II.

#### A. Chronological Summary

Beginning as early as 1985 and continuing to mid–1992, Covington organized and led a cocaine and marijuana distribution operation in northern Virginia. Over the life of the conspiracy approximately 100 kilograms of cocaine and 1000 pounds of marijuana were distributed.[2] By 1990, Covington was the subject of a grand jury investigation. In the course of this investigation, the government seized for forfeiture a number of Covington's assets alleged to be drug-related. More specifically, the seized assets, worth hundreds of thousands of dollars, included Covington's

---

1. Revised pursuant to Order dated February 22, 1994.

2. Cocaine, not marijuana, was the conspiracy's principal focus. Marijuana distribution efforts

home,[3] four cars, $238,000 cash (largely in $100 bills), a boat and several certificates of deposit. These seizures, it appears, prompted Covington to retain the law firm of Phillips, Beckwith and Hall. Yet, neither Covington nor this law firm contested the seizures and, as a result, many of the pieces of property, excluding the home and the cash, were forfeited administratively without protest.

In July 1991, additional seizures of Covington's drug-related assets occurred pursuant to a new series of search and seizure warrants obtained by the government in connection with the grand jury investigation. The seized assets on this occasion included more cash, jewelry worth thousands of dollars and a motorcycle, as well as two tow trucks and two business bank accounts, the latter items being the remaining assets of Covington's auto service business.

In August 1991, shortly after this second series of seizures, and perhaps spurred by them and his growing dissatisfaction with the Phillips, Beckwith and Hall firm, Covington moved to retain the Law Firm to act as his counsel. In this connection, Covington paid the Law Firm a total of $103,800 in cash, $17,000 of which was received and accepted by the Law Firm on August 23, 1991 and the remaining $86,800 the following day. These cash transfers are the focus of this proceeding; their details and circumstances are more fully described after the complete chronological factual picture is painted.

Once on board in August 1991, the Law Firm argued successfully for delaying the indictment, then imminent, so that plea negotiations might be pursued and to enable Covington to be hospitalized for treatment of mental depression and related problems. These plea negotiations failed, and on October 30, 1991, Covington and a number of other individuals were indicted on a variety of drug trafficking, firearms and money laundering charges. Following the indictment, several individuals, including a major drug customer of Covington's [4], began to cooperate with the government. This customer identified Covington's main supplier in Florida and provided evidence suggesting that Covington had paid the Law Firm with drug trafficking profits. As a result of this and other new information, a superseding indictment was returned in January 1992. Both this indictment and the original included a forfeiture count,[5] which noted that one of the forfeited assets was $168,000 in currency, representing cocaine profits not yet accounted for by the ongoing investigation.

In February 1992, government agents stepped up efforts to ascertain whether the sums paid the Law Firm were drug trafficking proceeds. In this connection, IRS Currency Transaction Reports ("CTR") filed by the Law Firm were examined and found to reflect deposits of $17,000 and $86,000 into the Law Firm's account on the dates the cooperating witness had said the tainted money was paid by Covington to the Law Firm.[6] But because these forms did not identify the source of the money,[7] there was

and profits were small compared to those associated with cocaine.

3. Although the home was seized in 1990, Covington was allowed to remain living there for some period.

4. William "Junior" Atkinson.

5. This forfeiture count provided, in pertinent part, as follows:

Pursuant to Title 21, United States Code, Section 853(a), the defendants shall forfeit to the United States of America any and all properties constituting, or derived from, proceeds the defendants obtained, directly or indirectly, as a result of a conspiracy and any properties used, or intended to be used by the defendants in any

manner or part, to commit, or to facilitate the commission of such violation.

6. I.R.S. "Form 8300s" require that any person who, in the course of business, receives cash receipts of over $10,000 to identify the person from whom the cash was received, identify the agent conducting the transaction, and disclose the nature of the transaction. See United States v. Leventhal, 961 F.2d 936, 937–38 (11th Cir. 1992).

7. The Law Firm elected not to list Covington's name on the forms as the source of the cash on the grounds that to do so would infringe the attorney-client privilege and Covington's Fifth Amendment privilege. Although the Fourth Circuit has not yet decided the issue, two circuits have held that law firms must disclose the

as yet no conclusive evidence to establish that Covington was the source of the money. To pursue this point, the government sought and obtained search warrants for the Law Firm's accounts relating to these deposits. Again, the records searched confirmed the $103,800 deposit, but not the source of the money.

Contemporaneously with the bank search warrants, the government served subpoenas *duces tecum* on both Phillips, Beckwith & Hall and the Law Firm.[8] The Law Firm moved to quash the subpoena on the grounds that enforcement would (i) impermissibly interfere with an accused's right and opportunity to retain counsel and (ii) improperly tip in the government's favor the delicate balance of power between the prosecution and the defense. Another judge of this division granted the motion to quash the subpoena on the ground that the subpoena chilled Covington's right to retain effective counsel. The government appealed and the case was stayed pending the appeal.[9]

Up to this time, March 1992, the Assistant United States Attorneys prosecuting the criminal case, including the forfeiture, had not obtained the requisite permissions from the U.S. Attorney and the Assistant Attorney General to forfeit the fees paid to the Law Firm. By early May 1992, these permissions had been obtained and the government then filed a bill of particulars identifying the $103,800 paid to the Law Firm as an item subject to forfeiture under the indictment. Shortly thereafter, the government also sought and obtained this Court's Order re-

straining the Law Firm from disbursing the $103,800 in fees it received from Covington.

The next event of significance occurred in July 1992, when the government advised the Court and the Law Firm that Covington, then in pre-trial detention at Alexandria Detention Center, had sent word through another inmate housed at the Center that he, Covington, wished to plead guilty but the Law Firm would not let him do so because, ostensibly, it would reflect poorly on the Law Firm. In its pleading reporting this event, the government suggested that a conflict of interest now existed between Covington and the Law Firm. In response, the Law Firm sought dismissal of the indictment on the ground of government misconduct, including a violation of Covington's Sixth Amendment rights. Following two hearings, the Court ruled that a conflict existed, requiring the withdrawal of· the Law Firm as Covington's counsel.[10] The Court then appointed new counsel [11] with directions to review the pending motion to dismiss the indictment and advise the Court whether Covington wished to (i) pursue the pending motions, (ii) file new or additional motions or (iii) follow some other course. New counsel, after reviewing the record and consulting at length with Covington, filed no new motions, nor did it pursue the pending motion. Instead, Covington pled guilty to three counts of the indictment, specifically a drug conspiracy in violation of 21 U.S.C. § 846, money laundering offense in violation of 18 U.S.C. § 1956, and a firearms offense in violation of 18 U.S.C. § 924(c). Covington was subsequently sentenced to 262

---

client's name as the source of the cash on the Form 8300. *See United States v. Leventhal,* 961 F.2d 936, 940 (11th Cir.1992); *United States v. Goldberger & ·Dubin, P.C.,* 935 F.2d ·501 (2d Cir. 1991).

8. The Assistant United States Attorney then in charge of the prosecution also wrote the Law Firm at this time, *inter alia* asserting that the omission of the payee's name from the Form 8300 was a criminal offense under 26 U.S.C. §§ 6050I, 7203. The government later voluntarily withdrew this letter in open court in response to the Law Firm's vehement objection.

9. This appeal was ultimately dismissed as moot by the Court of Appeals, apparently on the assumption that the Law Firm intended voluntarily to supply enough of the requested information to

satisfy the government. Disputes over whether this occurred are immaterial to the resolution of the question at bar.

10. *See Wood v. Georgia,* 450 U.S. 261, 101 S.Ct. 1097,· 67 L.Ed.2d 220 (1981) (where a constitutional right to counsel exists, Sixth Amendment jurisprudence holds that there is a correlative right to a conflicts free representation); *cf. United States v. Pryba,* 674 F.Supp. 1502 (E.D.Va. 1987).

11. Because of the breadth and scope of the Covington conspiracy, many experienced Northern Virginia defense attorneys already represented persons with some connection to the case. As a result, the Court found it necessary to appoint experienced District of Columbia counsel for Covington.

months incarceration to be followed by five (5) years of supervised release and a total of $150 in special assessments.[12]

Pursuant to the plea agreement, a consent order of forfeiture was entered at the time of sentencing, forfeiting, under 21 U.S.C. § 853 and 18 U.S.C. § 982, virtually all of Covington's assets, including cash, real estate, the auto service business and various firearms.[13] The Court then entered an order forfeiting the $103,800 fee paid to the Law Firm, which forfeiture was explicitly conditioned on the rights of third parties to claim an interest in the money by filing a petition pursuant to 21 U.S.C. § 853(n). Notice was appropriately published and the Law Firm filed a petition claiming the $103,800. Specifically, the Law Firm claimed that it received the money as a bona fide purchaser at a time when it was reasonably without cause to believe that the money was subject to forfeiture as drug trafficking proceeds.[14] A two day evidentiary hearing was held on the Law Firm's petition. Among the witnesses who testified at the hearing were Covington and several of his co-conspirators on behalf of the government and, on behalf of the Law Firm, two of its named partners plus another, former Covington attorney.

## B. The Source of the $103,800 Fee

■ The hearing record compels the conclusion that the $103,800 in cash paid to the Law Firm constituted the proceeds from Covington's drug trafficking activities. There was simply no credible or persuasive evidence to the contrary. Covington repeatedly and convincingly testified that the $103,800 he paid to the Law Firm was directly derived from his drug distribution activities.[15] He also testified, more specifically, that the $17,000 he paid the Law Firm on August 23 was virtually all drug proceeds obtained from five named cocaine customers. The small amount of remaining cash in the $17,000 came from his seized business, which the evidence convincingly showed was subsidized by cocaine profits, used to launder his cocaine profits, and used to facilitate the distribution of drugs.[16] Thus, there is no reasonable doubt that the $17,000 payment, shown by the bank's CTR to have consisted of $3000 in $100 bills and $14,000 in smaller

12. More specifically, Covington received 202 months imprisonment on the drug conspiracy count and 60 months on the money laundering and firearms counts, with the terms of the conspiracy count and laundering count to run concurrently with each other and the firearms term to run consecutively to the other two counts. No Rule 35, Fed.R.Crim.P., motion has yet been filed, although it appeared that Covington had been actively cooperating.

13. The remainder of Covington's property covered in the indictment's forfeiture count had previously been administratively forfeited.

14. The Law Firm also sought to preclude forfeiture of the fee on the ground of prosecutorial misconduct. The Court, after considering the parties' briefs and oral arguments, denied this motion, finding no prosecutorial misconduct.

15. Given the record as a whole, the Court finds this testimony credible and persuasive, notwithstanding that Covington is alleged to have made a contrary statement to a Law Firm partner and another lawyer while he, Covington, was a patient at St. Elizabeth's Hospital. Testimony concerning this alleged prior inconsistent statement came from Henry Asbill, a lawyer called in on the case by Law Firm partners when concerns about a conflict were raised. Yet, on close scru-

tiny, there is substantial doubt that Covington made the statement. First, while Asbill kept notes of the conversation, the notes make no mention of the statement. Further, the Law Firm partner made no reference to the statement in his testimony and while he may not have been asked a question precisely calling for disclosure of the statement, it seems likely that it would have been considered sufficiently material to merit mention in the course of the partner's direct examination. Covington, for his part, claims he never discussed with Asbill, whom he did not trust, or with anyone, whether the fee was paid with drug trafficking proceeds. Quite apart from a substantial doubt that the statement was made, it is plausible, as the government argues, that Covington, if he made the statement, was referring to buried and hence literally dirty money and not to drug proceeds. Finally, even if Covington made the statement, which is unlikely, it would not be persuasive. All of the other relevant evidence leaves no reasonable doubt that the $103,800 constituted drug trafficking proceeds.

16. Because Covington was himself a drug abuser and devoted most of his time to distributing drugs, there came a time when the expenditures in his auto service business exceeded the receipts. He funded this deficit with drug proceeds and paid his employees with these proceeds.

bills, was "property constituting, or derived from" Covington's illicit drug trafficking. 21 U.S.C. § 853(a)(1) (1993).

The same conclusion is compelled with respect to the $86,800 payment made on August 24. Like the $17,000 payment, this payment was made in cash and specifically in bills of $100 or less. According to the bank's CTR, the payment consisted of $85,800 in $100 bills plus $1000 in smaller bills. The source of this money is worth recounting. In May 1990, when the government seized $238,000 in cash from his safety deposit box, Covington feared authorities would soon search his house and seize money he kept there. Accordingly, he took $100,000 in drug proceeds he had in the house, placed it in a Safeway bag and buried the bag under some leaves by the side of a road. Three months later he retrieved the money, finding it somewhat discolored by moisture and damaged by insects. With the help of various co-conspirators, Covington managed to clean some of the bills and exchange others for new bills. In May 1991, Covington again buried approximately $60,000 to $80,000, $30,000 of which consisted of crisp, new $100 bills Covington had obtained from a confederate in exchange for the damaged and discolored bills. An additional $30,000 or so, also in bills of $100 or less, came from a co-conspirator as payment for drugs. Stung by experience, Covington buried this money in two three-inch PVC pipes. On August 24, 1991, he retrieved this money and put it in a Ritz cracker box to transport it to the Law Firm to pay the $100,000 fee the Law Firm required to take his case. And because the disinterred money added to the $17,000 previously paid was not enough to cover the $100,000 fee, Covington on August 24 collected an additional (approximately) $32,000 in drug debts from a customer,[17] who then helped him count the money. The disinterred drug money, plus the collected drug debts totaled $86,800 in drug proceeds, which was then given to the Law Firm on August 24. Although the total payments made on August 23 and 24 exceeded the required $100,000 up front retainer, the Law Firm told Covington it would retain the additional $3800 as an advance on expenses.

In sum, the credible record points convincingly, if not conclusively, to the conclusion that the $103,800 paid to the Law Firm constituted proceeds from Covington's drug trafficking activities.[18]

## C. The Law Firm's Meetings with Covington

There were three early meetings between Covington and the Law Firm. These meetings are material to the question whether the Law Firm was "reasonably without cause to believe that the [$103,800] was subject to forfeiture" under § 853(n)(6). Each is therefore separately treated.

The first meeting occurred on August 22 when Covington visited the Law Firm's offices in the company of a co-conspirator who had received a grand jury subpoena. In the course of the meeting, it was decided that the Law Firm would represent Covington and that the co-conspirator would be referred to another attorney. The co-conspirator then departed and the meeting continued with just Covington and the Law Firm partners present.

In the course of this lengthy meeting, Covington told Law Firm partners that he had been a cocaine distributor since 1986,[19] that

---

**17.** This customer, William "Junior" Atkinson, provided credible corroborating testimony on these matters at the hearing.

**18.** Additional evidence supporting this conclusion includes Covington's testimony that by 1990, he had lost all the legitimate money he had accumulated prior to becoming a drug dealer. This resulted from a variety of causes, including theft by a girlfriend of $130,000, his house purchase, and the government seizures. By 1991, according to Covington, he was broke. His depressed financial state, he related, caused him to change the way he did his drug business. In the

past, he claimed he had typically paid cash for drugs. Indeed, he claims he was known as "cash Paul." But by 1991, he was broke and had to be "fronted" the drugs.

**19.** Covington falsely told the Law Firm partners he had distributed no more than 15 kilograms of cocaine over the life of the conspiracy. But by the end of the third meeting, the Law Firm partners had ample reason to regard this statement with skepticism. Indeed, the Law Firm partners noted that skepticism in this regard was one reason they required a relatively high advance payment on the fee.

he had used his business to facilitate his drug trafficking and that the government,[20] in a series of two seizures, had seized essentially everything he owned.[21] Significantly, Covington disclosed that he was continuing, even then, to sell drugs because, as he put it, "he was broke." [22] At one point in the session, Covington became emotional, declared he had nothing left to live for and revealed a history of mental problems coupled with long-term drug and alcohol abuse.

By either the end of the meeting or early the next day, the Law Firm partners had told Covington that a $100,000 retainer would be required for them to undertake the representation. They also told Covington that cash would be acceptable and that the Law Firm would omit Covington's name from the requisite Form 8300, based on the attorney-client privilege. One of the partners recalls telling Covington that the Law Firm could not accept "funny money", but does not contend that this term was defined or explained. And, for his part, Covington testified there was never any discussion concerning prohibited sources for the fee money.

The second meeting between Law Firm counsel and Covington took place the next day; it was at this meeting that Covington handed over $17,000 in cash. The bills, held together by a rubber band, were not examined by the Law Firm partner who received them. When offered a receipt, Covington declined, fearing, he said, that it would fall into FBI hands. The Law Firm then kept the receipt. The partners did not ask Covington any questions concerning the source of the cash.

After the second meeting on August 23, but before the third meeting on August 24, the Law Firm's partners met with the prosecutors to discuss the case. At this meeting, the partners persuaded the prosecutors to postpone the indictment to allow Covington

to check into a mental health facility and to pursue plea negotiations. Also, the prosecutors then gave the partners an overview of the case against Covington, as well as a list of seized assets. In discussing their case, the prosecutors described Covington's business as a sham operation used to launder drug proceeds. When the partners protested that the government had improperly seized legitimate assets, the prosecutors disclosed that an IRS net worth investigation had confirmed that all the assets seized were drug-related. There was no discussion of attorney's fees at this meeting.

It was at the third meeting between the Law Firm partners and Covington, on August 24, that Covington delivered to one of the partners a box containing the $86,800 in cash. As previously noted, the money was mostly in $100 bills with the remainder in smaller bills, all of which was banded together with scotch tape or rubber bands in $10,000 bundles. The Law Firm partner signed a receipt, but, as with the receipt for the $17,000 payment, the Law Firm retained it at Covington's request. Again, as in the case of the earlier payment, the Law Firm partners did not ask Covington any questions concerning the source of the $86,800. Nor did the partners ask Covington whether he still had any unseized legitimate assets of any kind, any money other than drug money, or any source of legitimate income.

## D. Subsequent Events

Less than a week after the August 24 meeting, the Law Firm partners met a second time with the prosecutors. On this occasion, the Law Firm partners were afforded the opportunity to read the lengthy affidavit filed in support of the search and seizure warrants. Among other things, the affidavit detailed the government's financial investiga-

---

**20.** Covington did tell the Law Firm partners that he had earned legitimate money in the car repair business, but he also told them that the business assets, including two tow trucks, had been seized.

**21.** Covington disclosed that a girlfriend had stolen $130,000 from him, which sum, he said, included $70,000 in legitimately acquired funds. He also reported that a divorce and child support

payments had played a role in depleting his assets, even prior to the seizures.

**22.** The Law Firm partners correctly advised Covington that he would have to cease his drug trafficking activities immediately if he wanted Law Firm representation. Covington confirmed that Law Firm partners were adamant on this point.

tion that concluded that Covington had spent or accumulated over $400,000 in the past few years and that these funds could only have come from his drug trafficking activities. Significantly, the affidavit also recited that Covington's accountant stated that Covington's auto business could not possibly have legitimately earned substantially more than the modest income reported to the IRS.[23] When told that Covington had spent or accumulated over $400,000 in the past few years, the accountant stated there was no way the money could have been derived from Covington's auto repair business. Finally, the affidavit also confirmed, as the partners had already been told, that Covington's legitimate businesses and bank accounts had been used to facilitate his illicit drug distribution activities.

Also within a week of the August 24 meeting, Law Firm partners met with Covington's previous lawyers from Phillips, Beckwith and Hall. At this meeting, lawyers from the Phillips firm discussed the matter with the Law Firm Partners and gave them their Covington case file. This file included a draft petition for return of Covington's house, as well as several witness interviews.

## III.

■ A threshold question is whether law firm fees are subject to forfeiture under § 853. The Law Firm repeatedly argues here that § 853 should not be read to reach attorneys' fees lest defendants' Fifth and Sixth Amendment rights be abridged. While this argument is not without some weight, it has been clearly rejected by Congress and the courts. To begin with, the clear and unambiguous language of § 853 and its legislative history "provide[s] no basis for con-

cluding that attorneys' fees are not subject to forfeiture," *In re Forfeiture Hearing as to Caplin & Drysdale*, 837 F.2d 637, 641 (4th Cir.1988) (*en banc*), *aff'd sub nom. Caplin & Drysdale Chartered v. United States*, 491 U.S. 617, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989).[24] To the contrary, as the Fourth Circuit and the Supreme Court held, § 853 reaches all forfeitable assets of a defendant, "without regard to whether he intends to use them to pay an attorney". *Caplin & Drysdale*, 837 F.2d at 641. The section exempts only those third party recipients of a defendant's assets "who have prior claims or are bona fide purchasers, without regard to whether they are attorneys." *Id.* And, as the Fourth Circuit further concluded, allowing § 853 to reach funds used to pay attorneys' fees "will have no effect on the basic and absolute Sixth Amendment right" to counsel. *Id.* at 643. While the right to counsel in certain circumstances is absolute, the right to counsel of choice is qualified; it "belongs only to those with legitimate assets." *Id.* at 645. There is no absolute right under the Constitution "to retain counsel of choice with illegally acquired assets." *Id.* at 646.[25]

In sum, the Law Firm cannot reargue here the important Constitutional and policy questions already resolved in *Caplin & Drysdale*. Section 853 unquestionably reaches tainted assets used to retain counsel or pay legal fees.

■ Nor is it persuasive to argue, as the Law Firm does, that *Caplin & Drysdale* stands for the proposition that attorneys acquire cause to believe that fees may be subject to forfeiture only through notice in an indictment. According to the Law Firm, since this indictment did not specifically list

---

**23.** Covington's auto service business corporate tax returns for fiscal years 1982 through 1989 reflected total taxable income of $5,267.

**24.** Worth noting is that one of the Law Firm partners involved in the Covington representation was thoroughly familiar with the *Caplin & Drysdale* litigation, having represented Leon D. Harvey, a defendant whose appeal was consolidated with that of the Caplin and Drysdale law firm.

**25.** *See also United States v. Goldberger & Dubin, P.C.*, 935 F.2d 501, 504 (2d Cir.1991) (Sixth

Amendment does not guarantee a client the right to choose a particular lawyer); *In re Grand Jury Subpoena Served upon John Doe*, 781 F.2d 238, 250–51 (2d Cir.1986) (*en banc*) (noting that "[c]riminal defendants have been constitutionally required to retain other counsel when the need to preserve the highest ethical standards of professional responsibility outweighs the accused's …" usual prerogative to choose counsel), *cert. denied sub nom. Roe v. United States*, 475 U.S. 1108, 106 S.Ct. 1515, 89 L.Ed.2d 914 (1986).

legal fees, there was no reason to believe the fees were subject to forfeiture. This argument is flatly wrong; it is neither supported nor invited by *Caplin & Drysdale* or § 853.[26] To the contrary, fees received prior to indictment are subject to forfeiture where the other requirements of § 853 are met. At most, in circumstances other than those at bar, the absence of notice in an indictment may be one factor among many for courts to consider and weigh in determining whether an attorney was reasonable in believing that the fees were derived from legitimate sources and hence not subject to forfeiture.

### IV.

The Law Firm's petition is based on § 853(n)(6)(B). To prevail on its petition, therefore, the Law Firm must establish by a preponderance of the evidence (i) that it was a bona fide purchaser for value of the $103,-800 and (ii) that at the time of purchase, it was "reasonably without cause to believe" that the money constituted or was derived from Covington's drug trafficking activities. 21 U.S.C. § 853(n)(6)(B). The government concedes that the Law Firm provided legal services to Covington and therefore was a "purchaser for value." Thus, the central question presented is whether the Law Firm

was reasonably without cause to believe that the $103,800 in cash received from Covington was subject to forfeiture. In deciding this question, "the proper test to be applied under the statute is not merely whether the petitioner had knowledge of the forfeitability of the asset but whether the petitioner reasonably held the belief that the property was not subject to forfeiture." *United States v. Reckmeyer,* 836 F.2d 200, 204 (4th Cir.1987). And this standard, significantly, is objective, not subjective. In other words, a genuinely-held belief that property is not subject to forfeiture is unavailing unless that belief was objectively reasonable in the circumstances.

Measured by this standard, the Law Firm's petition fails. The evidence does not preponderate in favor of the Law Firm's claim that it reasonably believed the cash fee, when it was received,[27] was paid out of legitimately derived funds that Covington had "squirreled away" over the years. To the contrary, the record, taken as a whole, compels the conclusion that the Law Firm's belief that the cash fee came from legitimate sources was not reasonable in the circumstances. Indeed, in the circumstances, this belief was at best a hope, and a forlorn one at that.

---

**26.** To accept this meritless argument would result in carving out a special forfeiture exemption available only to lawyers, *i.e.*, fees are not subject to forfeiture absent formal notice from the government in the indictment. There is no caselaw or statutory warrant for such an exemption, which, if it existed, would be subject to abuse. Conceivably, attorneys might seek to delay an indictment to allow time to collect and commingle a fee. That did not occur here, however, as the Law Firm sought and won a delay in the issuance of the indictment for different and legitimate reasons.

**27.** In general, it seems appropriate to assess whether there exists reasonable cause to believe a fee payment is subject to forfeiture at the time a fee is earned. Until then the payment does not belong to the attorney. In Virginia a specified sum paid at the time of employment of the attorney to secure the lawyers' legal services for a specific matter is deemed to be an advanced legal fee which has been entrusted to the lawyer, and as such is rightfully deemed the property of the client. Virginia State Bar Opinion 1322, Feb. 27, 1990. A client may always discharge his attorney and, in that event, the fee is limited to a reasonable fee for actual services rendered

upon a *quantum meruit* basis, regardless of any contract to the contrary. *Heinzman v. Fine, Fine, Legum & Fine,* 217 Va. 958, 234 S.E.2d 282, 286 (1977), *cited in* Virginia State Bar Opinion 1246, June 1, 1989. *See, e.g., In the Matter of Cooperman,* 187 A.D.2d 56, 591 N.Y.S.2d 855 (1993), (The use of a "non-refundable fee" retainer is unethical and violative of an attorney's obligations under the Code of Professional Responsibility to refund unearned fees upon discharge.).

Thus, contrary to the Law Firm's contention, the fee was not fully earned at the time of payment. Even so, in the circumstances at bar, it is appropriate, chiefly for two reasons, to assess the reasonableness of the Law Firm's belief on August 24, essentially the time of receipt. First, the facts and circumstances known to the Law Firm after its early meetings with Covington and the prosecutors serve only to strengthen the case against the reasonableness of the Law Firm's belief regarding the source of the money. And second, significant complexities attend determining precisely when various portions of advance fee payments were earned. In other cases, the effort to make such a determination may be necessary, but it is not necessary here.

■ Myriad facts, most of which are essentially uncontroverted,[28] support this conclusion. Among the most significant are the following:

(a) In late August 1991, after meeting twice with Covington and once with the prosecutors, the Law Firm knew that for approximately a year a federal grand jury investigation had targeted Covington as the leader of a major cocaine distribution organization and that the government, in a series of seizures, had seized for forfeiture Covington's home, his business, his business assets and accounts, his boat, his cars, and approximately $240,000 in cash. The Law Firm further knew that these seizures were based on a judicial officer's finding of probable cause to believe the assets were subject to forfeiture.

(b) The Law Firm further knew that in addition to these seizures, Covington claimed that a girlfriend had stolen $130,000 in cash from him, $70,000 of which he claimed were legitimately-made funds.

(c) Covington told the Law Firm that he was a long-term drug and alcohol abuser, that his only legitimate employment and business was as an auto mechanic operating an auto repair shop, that he had used his business to facilitate his drug dealings, that he was divorced and making child support payments and that as a result of the divorce, the government seizures and the theft of his money, he was now broke, which was why he was continuing, even then, to sell drugs.

(d) Covington told the Law Firm he could only pay in cash, which he did, mostly in $100 bills with the remainder in smaller bills. The seventeen thousand dollars had come from his pocket and the $86,800 was delivered in a box containing taped or banded $10,000 bundles.[29]

(e) Covington refused receipts for the cash, fearing they would fall into FBI hands.

(f) The Law Firm learned from the prosecutors and the seizure affidavit that a government net worth investigation had accounted for all of Covington's legitimate income and concluded that all the assets seized were drug-related.[30]

28. Virtually all the facts relied on in reaching this conclusion were essentially undisputed. The Court did not find that any witness knowingly testified falsely; all of the witnesses were credible. While there were some conflicts in the testimony, those conflicts were likely attributable to the variability and fallibility of human memory, not to intentional falsehoods. Not infrequently, different people innocently remember events differently. The fact that the witnesses were credible combined with the fact that the few testimonial conflicts were frequently immaterial, led the Court to conclude that no witness deliberately testified falsely. An example of an inconsequential conflict is that Covington testified that he delivered the $86,800 in cash in a Ritz cracker box, whereas a Law Firm partner recalled a shoe box.

29. The Law Firm's acceptance of this large amount of cash is especially significant in light of the following statement from the Fourth Circuit's *en banc* opinion in *Caplin & Drysdale:*

[I]f a defendant has any uncontested assets, the attorney should be able to satisfy himself that he is paid out of these assets with little difficulty, and thus have no fear of fee forfeiture. *On the other hand,* where an attorney chooses to accept payment in assets named in a forfeiture indictment *or a huge cash sum;* any later attempts to avoid knowledge would be insufficient to qualify the attorney as a bona fide purchaser.

*In re Forfeiture Hearing as to Caplin & Drysdale,* 837 F.2d 637, 647 (4th Cir.1988), *en banc* (emphasis added), *aff'd sub nom. Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989).

30. The Law Firm's claim that the affidavit supported an inference they drew that Covington had squirreled away as much as $300,000 per year in legitimate funds from his automobile businesses is flatly wrong. The affidavit, to the contrary, forecloses such an inference. In any event, the Law Firm knew the business had been used to facilitate the drug trafficking and hence it knew that legitimate funds generated by the business since then were also subject to forfeiture. Because the government's right to the business relates back to the time the business was used to facilitate a drug offense (or involved in money laundering), the government is legally entitled to all the gains thereafter accruing from the business. *See United States v. Bucuvalas,* 970 F.2d 937, 946–48 (1st Cir.1992) (indicating, in the context of a § 1963 forfeiture, that the government is entitled to interest), *cert. denied,* — U.S. ——, 113 S.Ct. 1382, 122 L.Ed.2d 758 (1993).

It is true, as the Law Firm points out, that property traceable to income generated by a business before its use to facilitate a drug offense is not subject to forfeiture. *See United States v. Borromeo,* 995 F.2d 23, 25 (4th Cir.), *reaff'd in part, vacated in part and remanded,* 1 F.3d 219

Quite apart from what the Law Firm knew, there is that which it chose not to know. Thus, the Law Firm partners did not ask Covington directly and pointedly to identify the source of the funds.[31] Nor did they inquire what, if any, legitimate sources of funds Covington had. None of the reasons adduced to explain these omissions are persuasive to convert the Law Firm's view as to the money's source from a forlorn hope to a reasonable belief. In these circumstances, especially where large sums of cash are involved,[32] failure to make a direct inquiry may be tantamount to wilful blindness, which would invite the inference that an adverse answer would have been given had the question been asked.[33] Thus, when confronted with circumstances essentially similar to those at bar attorneys should inform prospective clients that they cannot pay fees with drug proceeds and that such proceeds are subject to forfeiture, even in the attorney's hands.[34] If the prospective client answers that the money comes from legitimate sources, attorneys should take whatever further steps or ask whatever further questions may be suggested by the circumstances to satisfy themselves that it is objectively reasonable to believe the answer. To be sure, attorneys are not required to conduct thorough financial investigations of clients before they can accept fees. Rather, they must ask sufficient direct questions and take whatever further steps the client's answers might indicate to ensure that a belief that the funds are legitimate is objectively reasonable. No precise formula exists to define the appropriate inquiry in all circumstances. Each situation may be different. The polestar is that the attorney's belief must be objectively reasonable. In the circumstances at bar, a direct

(1993). But there was simply no reasonable basis for the Law Firm to have reasonably believed that the business had accumulated $100,000 in pre-drug profits that Covington had "squirreled away" out of "reverence for old money."

31. Interestingly, one of the Law Firm partners noted that had Covington gone to a bank to convert the cash to a cashier's check he would likely have faced the bank's inquiries as to the source of the funds. This observation begs the question whether the Law Firm should have been satisfied with less.

32. Courts have frequently remarked on the fact the large sums of cash and drugs frequently go together. Thus, even without the presence of drugs or drug paraphernalia, "carrying a large sum of cash is strong evidence that the property was exchanged for or intended to be exchanged for drugs," and that $2,500 in cash "is substantially greater than is commonly kept in residential premises by law-abiding wage earners." *United States v. $95,945.18 in U.S. Currency*, 913 F.2d 1106, 1111 (4th Cir.1990), *quoting United States v. $215,300 in U.S. Currency*, 882 F.2d 417, 419 (9th Cir.1989), *cert. denied*, 497 U.S. 1005, 110 S.Ct. 3242, 111 L.Ed.2d 752 (1990); and *United States v. $2,500 in U.S. Currency*, 689 F.2d 10, 16 (2d Cir.1982), *cert. denied sub nom. Aponte v. United States*, 465 U.S. 1099, 104 S.Ct. 1591, 80 L.Ed.2d 123 (1984). *See also United States v. $93,685.61 in U.S. Currency*, 730 F.2d 571, 572 (9th Cir.), *cert. denied sub nom. Willis v. United States*, 469 U.S. 831, 105 S.Ct. 119, 83 L.Ed.2d 61 (1984) (the extremely large amount of money found is itself strong evidence that the money was furnished or intended to be furnished for drugs); *United States v. Thomas*, 913 F.2d 1111, 1115 (4th Cir.1990) (citations omitted) ("[T]he possession of unusually large amounts of cash ... or the making of uncommonly large cash purchases ... may be circumstantial evidence of drug trafficking."); *United States v. $25,055.00*, 728 F.Supp. 1406, 1408–09. (E.D.Mo.1990) ("The large quantity of money involved infers a linkage to drug trafficking.").

33. *Cf. United States v. Campbell*, 977 F.2d 854 (4th Cir.1992) (Willful blindness may warrant inference of knowledge; whether real-estate agent, who ignored tell-tale signs, including the flashing of large sums of cash, was wilfully blind created a jury issue as to agent's guilty knowledge that client was drug dealer and cash constituted drug proceeds) *cert. denied* — U.S. —, 113 S.Ct. 1331, 122 L.Ed.2d 716 (1993).

34. For an example of the perils of attorneys accepting fruits of a crime, *see Cf. In re Ryder*, 263 F.Supp. 360 (E.D.Va.1967) (Attorney who took possession of money and a weapon, learning that the money was taken in the course of an armed robbery in which the weapon was used, was suspended from practice in federal court for eighteen months; suspension might have been permanent had the attorney not sought advice of other lawyers and professors.), *aff'd*, 381 F.2d 713 (4th Cir.). The Law Firm apparently tried to do something like this when a partner informed Covington that the Law Firm could not accept "funny money." But this term was not defined and the partner was apparently neither clear nor explicit as to what the statement meant. In circumstances like those at bar, it is important to be clear and explicit, as Covington considered that he was not being asked directly what the source of the money was because, as he put it, the Law Firm did not want to know the answer.

question concerning the source of these funds would almost certainly have elicited a response that would have precluded acceptance of the money or a response that on further questioning would simply not have been reasonably believable.

■ The Law Firm argues that its petition should be granted as a matter of law because the Department of Justice ("DOJ") Guidelines in effect at the time indicated that the government would refrain from seeking forfeiture of legal fees absent actual knowledge of forfeitability on the part of an attorney.[35] The Law Firm further argues that even if the Guidelines do not compel a Law Firm victory as a matter of law, the existence of the Guidelines which was known to Law Firm partners, added to the prosecutors' failure to advise the partners in their August 23 meeting that fees would be subject to forfeiture, are factors that establish the reasonableness of the Law Firm partners' belief that the cash fee came from legitimate sources and was not subject to forfeiture. Neither argument scores; both miss the mark. The issue is not whether the Law Firm reasonably believed DOJ would seek forfeiture, but rather whether the Law Firm partners reasonably believed the cash fee was subject to forfeiture. On this latter question, the *Caplin & Drysdale* opinions, also well-known to the Law Firm partners, make clear that actual attorney knowledge of the illegitimacy of the fee source is not the standard. Indeed, the Guidelines themselves confirm that they do not establish any legal standard:

> These guidelines are set forth solely for the purpose of internal Department of Justice guidance. They are not intended to, do not, and may not be relied upon to create any rights, substantive or procedur-

al, enforceable at law by any party in any matter civil or criminal, nor do they place any limitations on otherwise lawful litigative prerogatives of the Department of Justice.

Because the Guidelines do not establish the governing forfeiture standard and indeed explicitly warn against reliance for that purpose, they are of no avail to the Law Firm either to prevail as a matter of law or to buttress the claimed reasonableness of the Law Firm's belief that the fee was not subject to forfeiture.

■ The prosecutors' silence on fee forfeiture at the August 23 meeting is also unhelpful to the Law Firm. The prosecutors had no legal obligation to raise the issue at the meeting. Their silence on the matter was at best ambiguous. Any inference that the Law Firm partners drew from this silence deserves the label of tenuous or strained. In any event, any such inference is dwarfed by the mass of evidence available to the Law Firm partners in August 1991 that pointed convincingly to the conclusion that the cash fee constituted, or was derived from, drug trafficking proceeds.

Similarly unavailing to the Law Firm is the fact that the indictment, when issued, did not specifically list the fee as subject to forfeiture. Yet, Rule 7(c) Fed.R.Crim.P. "does not ... require that the indictment describe each item subject to forfeiture. This can be done in a bill of particulars." *United States v. Raimondo,* 721 F.2d 476, 477–78 (4th Cir.1983), *cert. denied sub nom. Bello v. United States,* 469 U.S. 837, 105 S.Ct. 133, 83 L.Ed.2d 74 (1984) quoting from *United States v. Grammatikos,* 633 F.2d 1013, 1024–25 (2d Cir.1980)[36] Precisely this was done here. The forfeiture count in this

---

35. Specifically, the Guidelines provided as follows:

> Forfeiture of an asset transferred to an attorney as payment for legal fees for representation in a criminal matter may be pursued, notwithstanding the fact that the asset may have been transferred for legitimate services actually rendered, where there are reasonable grounds to believe that the attorney had actual knowledge that the asset was subject to forfeiture at the time of the transfer.

36. *See also United States v. Amend,* 791 F.2d 1120 (4th Cir.1986) (emphasizing that an indictment need not describe each item subject to forfeiture), *cert. denied,* 479 U.S. 930, 107 S.Ct. 399, 93 L.Ed.2d 353 (1986); *United States v. Rupley,* 706 F.Supp. 751, 754 (D.Nev.1989) (where the indictment makes defendant aware that all profits from criminal enterprise are potentially forfeitable, "[t]he Government should not be foreclosed from seeking forfeiture of all property subject to penalty, simply because it listed some items with particularity").

indictment described the property subject to forfeiture in general terms that encompassed the fee even though the fee was not included in the non-inclusive listing of specific assets. And thereafter, a bill of particulars was filed specifically listing the fee. In any event, the indictment had not yet issued when the Law Firm accepted the $103,800 cash fee.[37] This is the time at which the reasonableness of the Law Firm's belief must be assessed.[38] And the central finding of this memorandum opinion is that, at this time, the facts and circumstances known to the Law Firm precluded a reasonable belief in the legitimacy of the cash used to pay the fee.

### V.

■ As supporting authority for its position, the Law Firm cites three recent Supreme Court decisions: (1) *Alexander v. United States*, —— U.S. ——, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993); (2) *Austin v. United States*, —— U.S. ——, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993); (3) *United States v. 92 Buena Vista Ave.*, —— U.S. ——, 113 S.Ct. 1126, 122 L.Ed.2d 469 (1993) (plurality opinion). None of these cases is apposite here; none supports the Law Firm's position.

*Alexander* simply held that criminal forfeiture of an entire business used to distribute obscene material was subject to the Excessive Fines Clause of the Eighth Amendment. *Alexander*, —— U.S. at ——, 113 S.Ct. at 2776. And *Austin* held that the Excessive Fines Clause of the Eighth Amendment applied to the civil forfeiture of property alleged to have facilitated a felony drug offense. *Austin*, —— U.S. at ——, 113 S.Ct. at 2812. This result followed from the ruling that forfeiture pursuant to the civil forfeiture provisions in issue, 21 U.S.C. § 881(a)(4) and (a)(7), constituted punishment of the owners of such property. *Id.*, —— U.S. at —— ——, at 2810–12. Both *Austin* and *Alexander* are inapposite because unlike the proper-

ties there in issue, the $103,800 in issue here, as well as the bulk of the property Covington forfeited administratively and judicially, constituted proceeds of drug trafficking. In these circumstances a forfeiture cannot be excessive. It is self-evident that a forfeiture of all the funds constituting or derived from drug trafficking cannot rationally be termed excessive. Put another way, a forfeiture is in no sense excessive where, as here, it merely divests a defendant of the money and other assets derived from an illegal activity. In any event, the record here confirms that Covington's forfeitures were not excessive. He derived between $1,000,000 and $2,000,000 in profits from his drug trafficking activities, whereas the total amount forfeited was less than $1,000,000.

Like *Alexander* and *Austin*, *Buena Vista* involved civil forfeiture under 21 U.S.C. § 881. Specifically at issue was real property that a drug dealer bought with drug proceeds and then gave to his girlfriend, a putative "innocent owner." *92 Buena Vista Ave.*, —— U.S. at ——, 113 S.Ct. at 1130. At the heart of *Buena Vista* was the simmering tension between the "innocent owner" defense and the "relation back" doctrine, both of which appear in the civil forfeiture statute. *See* 21 U.S.C. § 881(a)(6) and (h) (1993).

■ The "relation back" doctrine provides that title to forfeitable property vests in the government at the time of the commission of the offense warranting forfeiture. *See 92 Buena Vista Ave.*, —— U.S. at ——, 113 S.Ct. at 1135. Given this, a wrongdoer cannot pass title to forfeitable property because that title would already have vested in the government.[39] At odds with this, it appears, is the "innocent owner" defense, which provides that no property may be forfeited where the owner was without knowledge of the wrongdoing giving rise to forfeiture. *Id.*, —— U.S. at —— – ——, 113 S.Ct. at 1134–37. Faced with the conflict between these provi-

---

**37.** As already noted, fees paid prior to indictment are not immune from forfeiture. *See supra* Part III.

**38.** *See supra* n. 26.

**39.** Vesting is not automatic; "nothing vests in the government until some legal step shall be taken for the assertion of its rights, after which, for many purposes, the doctrine of relation carries back the title of to the commission of the offense." *92 Buena Vista Ave.*, —— U.S. at ——, 113 S.Ct. at 1135, quoting from *United States v. Grundy and Thornburgh*, 7 U.S. (3 Cranch) 337, 350–51, 2 L.Ed. 459 (1806).

sions, the Supreme Court in *Buena Vista* held that the "innocent owner" defense arguably trumps the "relation back" doctrine. More specifically, the plurality opinion held that a claimant is entitled to assert an "innocent owner" defense before the government can invoke the "relation back" doctrine. *Id.*, — U.S. at ——, 113 S.Ct. at 1137. In the context of that case, the ruling meant that a donee of real property purchased by the donor with drug proceeds might defeat forfeiture by showing she was an innocent owner.

*Buena Vista*, a civil forfeiture decision, is of no use to the Law Firm in this criminal forfeiture matter. Concurring in *Buena Vista*, Justice Scalia explicitly recognized the differences between the civil and criminal forfeiture schemes. *92 Buena Vista Ave.*, — U.S. at ——, 113 S.Ct. at 1141.[40] And in any event, to the extent that § 853(n)(6)(B) is the criminal forfeiture analog to the "innocent owner" defense, the Law Firm, as this opinion concludes, cannot establish the defense. Had the Law Firm established the reasonableness of its belief under § 853(n)(6)(B), it would have prevailed despite the "relation back" doctrine codified in § 853(c).[41] Since it did not do so, § 853(c) operated here to require forfeiture of the cash fee.[42]

## VI.

■ In summary, this memorandum opinion concludes that whether an attorney is reasonably without cause to believe that a fee payment is subject to forfeiture depends on the facts and circumstances of each case and that in this case the Law Firm fell far short

of proving by a preponderance of the evidence that, at the time the $103,800 cash fee was received, the Law Firm was reasonably without cause to believe that the money was subject to forfeiture.

In reaching this conclusion, the Court is not unmindful of the considerable difficulties criminal defense attorneys face as they carry out their day-to-day duties in the trenches of the criminal justice system. Nor is the Court unmindful of the vital role able defense counsel, retained and appointed,[43] play in giving effect to the Bill of Rights' fundamental guarantees and in ensuring that the innocent are never convicted. Given their vital roles, able defense counsel should not be unnecessarily discouraged from entering the criminal justice fray. This memorandum opinion and the result it reaches do not do so. Instead, apart from the result reached on the specific facts at bar, the modest teaching of this memorandum opinion is that under certain circumstances attorneys are on notice that a fee payment may be subject to forfeiture and that in those circumstances, attorneys have a duty to make inquiries. The scope of this duty is determined by the circumstances. The circumstances at bar, especially the use of large sums of cash in relatively small bills, required that the Law Firm partners inquire directly of Covington as to the source of the money. This is not a heavy burden. If Covington had responded truthfully, then the Law Firm would have been compelled to decline the fee payment and of course would also have been at liberty to accept or decline the representation. There is no constitutional right to retain counsel of choice with drug proceeds. Had the Law Firm declined the representation, Covington,

40. These differences were also noted in the Third Circuit opinion affirmed in *Buena Vista*. *See United States v. A Parcel of Land, Buildings, Appurtenances and Improvements Known as 92 Buena Vista Ave., Rumson, N.J.*, 937 F.2d 98 (3rd Cir.1991).

41. Section 853(c) provides that:
Any such property [*i.e.*, property derived from drug trafficking or used to facilitate such activities] that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United States ...

42. As the Fourth Circuit put it, "[a]pplication of this [§ 853(c)] to fees paid to an attorney prior to a conviction results in forfeiture of the fees, because the government's interest in the property predates the transfer to the lawyer." *In re Forfeiture Hearing as to Caplin & Drysdale*, 837 F.2d 637, 640 (4th Cir.1988), *en banc, aff'd sub nom. Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617[, 109 S.Ct. 2646, 105 L.Ed.2d 528] (1989).

43. In this Division, private criminal defense attorneys frequently accept appointed representations, as well as paid representations.

who had no legitimately derived funds, would have received appointed counsel, a constitutionally adequate result and in fact, the result that ultimately occurred. On the other hand, if Covington had falsely claimed that the source of the cash was legitimate, further questioning by the Law Firm partners would doubtless have disclosed this falsehood, given the circumstances. This result should not unduly discourage able defense attorneys, for it should come as no surprise to them that they, too, like everyone else in society, cannot accept drug proceeds in payment for goods or services unless they are reasonably without cause to believe that the funds are not drug proceeds.

In the final analysis, therefore, the modest teaching of the result reached here is that attorneys have no special or privileged status when it comes to criminal forfeiture pursuant to § 853; rather, they are subject to the provisions of that section in the same manner as everyone else in society.

The Clerk shall send copies of this Memorandum Opinion to counsel of record and to the law firm of Moffitt, Zwerling and Kemler.