**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.

MOFFITT, ZWERLING & KEMLER, P.C.,

Defendant-Appellee.

AMERICAN CIVIL LIBERTIES UNION OF
VIRGINIA; NATIONAL ASSOCIATION OF
CRIMINAL DEFENSE LAWYERS,
Amici Curiae.

No. 95-1884

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

MOFFITT, ZWERLING & KEMLER, P.C.,

Defendant-Appellant.

AMERICAN CIVIL LIBERTIES UNION OF
VIRGINIA; NATIONAL ASSOCIATION OF
CRIMINAL DEFENSE LAWYERS,
Amici Curiae.

No. 95-1916

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis III, District Judge.
(CA-94-1384-A, MISC-93-6-A)

Argued: March 5, 1996

Decided: May 9, 1996

Before WILKINSON, Chief Judge, and LUTTIG and MICHAEL,
Circuit Judges.

_____

Affirmed in part, reversed in part, and remanded with instructions by
published opinion. Chief Judge Wilkinson wrote the opinion, in
which Judge Luttig and Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** Gordon Dean Kromberg, Assistant United States Attor-
ney, Bernard James Apperson, III, Assistant United States Attorney,
Alexandria, Virginia, for Appellant. Arthur Francis Mathews, WIL-
MER, CUTLER & PICKERING, Washington, D.C., for Appellee.
**ON BRIEF:** Helen F. Fahey, United States Attorney, Alexandria,
Virginia, for Appellant. Craig M. Blackwell, Michael B. Bressman,
Craig J. Brown, Steven P. Finizio, WILMER, CUTLER & PICKER-
ING, Washington, D.C., for Appellee. Stephen B. Pershing, ACLU
FOUNDATION OF VIRGINIA, Richmond, Virginia; Peter Goldber-
ger, Ardmore, Pennsylvania, for Amici Curiae.

_____

**OPINION**

WILKINSON, Chief Judge:

In this appeal, we are asked to resolve important questions about
the operation and preemptive effect of the Comprehensive Forfeiture
Act of 1984 (CFA). 21 U.S.C. § 853. These questions arise out of the
government's effort to forfeit, as the proceeds of criminal activity, a
$103,800 legal fee paid to the law firm of Moffitt, Zwerling & Kem-
ler. The law firm and the government each allege numerous errors in
the district court's rulings. The firm contests the appropriateness of
forfeiting the fee when it was not specifically identified as subject to
forfeiture in the indictment, and it also appeals the rejection of its
claim that it was an innocent transferee under the CFA. We affirm the
district court with respect to these assignments of error. The govern-

2

ment, in turn, contests the limitations imposed on its efforts to ascertain the disposition of the fee. We affirm in part, and reverse in part the district court's rulings on this matter.

We reverse, however, with respect to the most significant issue raised by this appeal: the preemptive effect of the CFA on state claims of detinue and conversion brought by the government to recover the fee. The government brought these common law actions, in part because the law firm had dissipated most of the $103,800 by the time a restraining order was entered. We hold that these common law actions are consistent with the purposes of the federal forfeiture statute and that the CFA does not abrogate the government's authority to pursue them.

I.

In late August, 1991, William Paul Covington retained the law firm of Moffitt, Zwerling & Kemler to defend him against charges of drug trafficking and money laundering. Covington was then the subject of a grand jury investigation and many of his personal and business assets had already been seized. To secure the firm's representation, Covington was required to pay $100,000 up front. On August 23, 1991, Covington partially paid the fee with a wad of bills fished from his pocket that amounted to $17,000; the next day he delivered another $86,800 in cash, stored in a cracker box or a shoe box. Much of the $103,800 payment was in the form of $100 bills.

Neither William Moffitt nor John Zwerling asked Covington the source of the $103,800, though Moffitt apparently told Covington that, though they could accept cash, they could not accept "funny money." Covington refused a receipt for both payments because, he said, the F.B.I. might find it. The law firm thereafter filed the required Internal Revenue Service Form 8300 reflecting the cash payments from Covington, but failed to identify Covington as the source of the cash transfer.

Once retained, the firm notified prosecutors that they represented Covington. In a series of meetings with law firm members, the prosecutors outlined the nature of their case against Covington and provided a list of assets seized from Covington. These seizures included

3

his home, four cars, a boat, hundreds of thousands of dollars in cash, a motorcycle, and assets of his auto service and towing businesses, namely, two tow trucks and two bank accounts. Prosecutors also disclosed a 50-page affidavit, prepared by an IRS investigator, that supported search and seizure warrants executed against Covington. Among other things, the affidavit reported that Covington had accumulated or spent a vast amount of money in the previous few years, money which the investigator concluded could only have come from drug trafficking activity. Moreover, the investigator revealed that Covington used his businesses to facilitate drug sales and to launder drug profits.

On October 30, 1991, the grand jury indicted Covington on a variety of drug trafficking, firearm, and money laundering offenses. A superseding indictment was returned on January 9, 1992. Both the original and the superseding indictment contained counts providing for the forfeiture of "any and all properties constituting, or derived from, proceeds" obtained as a result of the illegal activity and any properties used to facilitate that activity. Such assets "include[d], but [were] not limited to" cash of up to $168,000 that the government had not yet located.

On May 12, 1992, after obtaining the approval of the Department of Justice, the government filed a bill of particulars identifying the $103,800 paid to the law firm as subject to forfeiture. It also sought and obtained a restraining order to prevent dissipation of the fee. 21 U.S.C. § 853(e)(1)(A).

In August, 1992, the district court disqualified the law firm from continuing to represent Covington. The judge observed that the most important reason for the disqualification was Covington's statement that while he wanted to plead guilty, he could not because one of his lawyers informed him that such a plea would place the law firm's acceptance of the fee in an unfavorable light. Another important reason for the disqualification related to the government's intention to use evidence concerning Covington's legal fee at trial. J.A. 567-68. New counsel was then appointed.

On September 25, 1992, Covington entered a guilty plea. He was sentenced in February, 1993 to 262 months in prison. At sentencing,

4

pursuant to 21 U.S.C. § 853, and with Covington's consent, the $103,800 fee paid to the law firm was ordered forfeited. Subsequently, the law firm sought to vacate the forfeiture order. It filed a petition asserting that it was "reasonably without cause to believe" that the fee was subject to forfeiture. 21 U.S.C.§ 853(n)(6)(B). The district court rejected the petition. In re Moffitt, Zwerling & Kemler, P.C., 846 F. Supp. 463 (E.D.Va. 1994) ("Moffitt I").

Thereafter, the government sought a final decree of forfeiture to collect the $103,800 from Moffitt, Zwerling. The firm maintained, however, that recovery was limited to the $3,695 that remained unspent at the time the district court entered the May, 1992 restraining order. Nearly all of the $103,800 fee was spent, in fact, as early as January, 1992. In response, the government pursued a number of remedies to retrieve some or all of the fee. First, it argued that the firm, under § 853, was liable to the government for the full $103,800; the district court rejected this claim. In re Moffitt, Zwerling & Kemler, P.C., 864 F. Supp. 527 (E.D.Va. 1994) ("Moffitt II"). Next, the government sought forfeiture of any property traceable to the fee as property "derived from" forfeitable assets. 21 U.S.C. § 853(a). Finally, to recover the fee, the government brought common law actions of detinue and conversion under Virginia law. The district court ruled on a variety of discovery disputes arising from the tracing effort, In re Moffitt, Zwerling & Kemler, P.C., 875 F. Supp. 1152 (E.D.Va. 1995) ("Moffitt III"), and it ruled that the state common law actions were preempted by the CFA. United States v. Moffitt, Zwerling & Kemler, P.C., 875 F. Supp. 1190 (E.D.Va. 1995) ("Moffitt IV"). Both the government and the law firm now appeal certain aspects of these rulings.

II.

We first address the alleged improprieties in the procedure employed by the government to subject the fee to forfeiture. Moffitt, Zwerling contends that the district court lacked jurisdiction to order forfeiture of the fee because that fee was not specified in the indictment. This claim is meritless. First, the indictment and the superseding indictment contained forfeiture counts naming"any and all properties constituting, or derived from" or used to facilitate criminal activities. The list of assets "include[d], but [was] not limited to . . . [a]ny and all interest of WILLIAM PAUL COVINGTON in $168,000

5

in United States currency." The indictment thus sought forfeiture of all the proceeds of Covington's criminal activity, explicitly including up to $168,000 not yet accounted for.

Moreover, the law firm's claim rests on the assumption that forfeiture is a substantive element of the offense, and therefore must be specified in the indictment. Stirone v. United States, 361 U.S. 212, 218-19 (1960). But the Supreme Court and this court have conclusively rejected the argument that forfeiture is a substantive element of offenses. Libretti v. United States, 116 S.Ct. 356, 363 (1995) ("Forfeiture is an element of the sentence imposed following conviction . . . .") (emphasis in original); United States v. Tanner, 61 F.3d 231, 234 (4th Cir. 1995) ("It is clear that forfeiture under § 853 is in fact punishment."), cert. denied, 116 S.Ct. 925 (1996); see also Alexander v. United States, 113 S.Ct. 2766, 2775 (1993) (criminal forfeiture is "a form of monetary punishment"). The conclusion that forfeiture is punishment, and not a substantive element of the offense, follows inexorably from the plain terms of § 853, which allow the forfeiture of assets of those "convicted," 21 U.S.C. § 853(a), and provides that forfeiture shall be imposed "in addition to any other sentence imposed." Id. (emphasis added).

Moffitt, Zwerling is correct that the government first specifically identified the $103,800 fee as subject to forfeiture in a bill of particulars filed after the superseding indictment. But this hardly dooms the forfeiture order. A bill of particulars is an appropriate way to pinpoint certain assets, noted in the indictment, as subject to forfeiture. United States v. Strissel, 920 F.2d 1162, 1166 (4th Cir. 1990); United States v. Raimondo, 721 F.2d 476, 477-78 (4th Cir. 1983), cert. denied, 469 U.S. 837 (1984); see also Libretti, 116 S.Ct. at 366. Moreover, the firm itself was in part responsible for the government's delay because it failed to identify Covington as the source of the cash payment on the required IRS forms. Moffitt II, 864 F. Supp. at 543 n.45. It is also difficult to identify any prejudice to the law firm from the procedure followed here: the firm does not even contest the district court's finding that the $103,800 fee represented the proceeds of criminal activity. Moffitt I, 846 F. Supp. at 468.

The law firm maintains, however, that the procedure followed here unconstitutionally upsets the balance between the state and the

6

accused. This argument is little more than an attempted end-run around Caplin & Drysdale, Chartered v. United States, 491 U.S. 617 (1989), which squarely rejected constitutional claims lodged against attorney fee forfeiture. There is simply no constitutional right to "spend another person's money for services rendered by an attorney." Id. at 626. The potential conflict between attorney and client posed by the forfeiture of this tainted fee resulted from the law firm's acceptance of the fee, not from the government's effort to forfeit it. In fact, the district court disqualified the law firm here in part because of disturbing testimony from Covington that the law firm's desire to protect its fee was overriding its obligation to represent its client. And though Moffitt, Zwerling vigorously asserts the risk of prosecutorial bad faith where the government follows the procedure it did here, the district court, "after extensive review of the record, conclud[ed] that there is no factual predicate for asserting a claim of prosecutorial abuse." J.A. 759.

In sum, we find no impropriety in the procedures employed by the government in this case to subject the fee to forfeiture.

III.

Moffitt, Zwerling further argues that its fee was not subject to forfeiture because it qualified as an innocent transferee whose assets could not be forfeited. See 21 U.S.C. §§ 853(c) & 853(n). It was, it claims, "reasonably without cause to believe that the property was subject to forfeiture." 21 U.S.C. § 853(n)(6)(B). After an extensive evidentiary hearing, however, the district court disagreed, concluding that: "[T]he record, taken as a whole, compels the conclusion that the Law Firm's belief that the cash fee came from legitimate sources was not reasonable in the circumstances." Moffitt I, 846 F. Supp. at 472.

We can find no fault with the district court's conclusion. Covington approached Moffitt, Zwerling as a known target of a far-reaching drug trafficking investigation. As the law firm knew, the government suspected that Covington was the leader of a major cocaine ring, id. at 473, and the government had seized nearly all of his personal and business assets. Id. at 470, 473. The extensive seizures were, as the law firm also knew, based on a judicial officer's determination that there was probable cause to believe the assets were subject to forfei-

ture. Id. at 473. Covington himself told the firm's partners that he used his businesses to facilitate drug dealing, id. at 469-70, 473, and the firm was aware of the government's conclusion that the considerable amount of money Covington had accumulated and spent could have only resulted from his drug trafficking activities. Id. at 470-71, 473. Despite this, the firm accepted from Covington two immense cash payments, totalling $103,800 and largely comprised of $100 bills, over a two-day period. At Covington's request, the firm did not give him a receipt for the $103,800 because Covington feared the receipt might fall into the hands of the F.B.I. Id. at 473. Such circumstances were, to put it mildly, highly suspicious.

The firm contends that its partners believed, based on their extensive interviews with him, that Covington had "squirreled" away substantial assets from legitimate business activity. And the firm asserts that Covington was informed that he could not pay in"funny money." The district court found, however, that Covington advised the firm's partners that he was broke, and for that reason continued to engage in illegal activity. Id. at 470, 473; J.A. 1062. In addition, during the supposedly extensive interviews with Covington, the firm's partners tiptoed around the most pertinent questions. They did not even ask Covington what legitimate sources of income he had. And, conspicuously, they avoided asking Covington exactly where he had obtained the $103,800 in cash to pay his legal fee. Moffitt I at 470, 474. In their meetings with Covington the lawyers did not seek to obviate doubts that any person would have had about the source of Covington's substantial cash payment. The meetings, in fact, create the impression that the participants were engaging in some sort of wink and nod ritual whereby they agreed not to ask -- or tell-- too much.

Based on this record, the district court observed, there was nothing less than a "mass of evidence available to the Law Firm partners in August 1991 that pointed convincingly to the conclusion that the cash fee constituted, or was derived from, drug trafficking proceeds." Id. at 475. We agree. Both what the law firm knew in August, 1991, and what it declined to inquire about, convinces us that it reasonably had cause to know that the $103,800 was subject to forfeiture, and thus its § 853(n)(6) petition was properly rejected.

8

IV.

The government thereafter sought a final decree of forfeiture for the $103,800. According to the law firm, the government's recovery was limited to $3,695, the amount of the fee that remained when the restraining order was entered in May, 1992. Seeking to recover the full amount of the fee, however, the government argued that under 21 U.S.C. § 853 the law firm was obligated to remit to the government the entire $103,800. The district court rejected this argument, Moffitt II, 864 F. Supp. 527, but observed that the government might have other remedies available to it, such as a state law conversion action, to recover the fee. Id. at 544 n.49. Consequently, the government brought common law actions of conversion and detinue under Virginia law to recover the full $103,800. The district court, however, ruled that the federal forfeiture law preempted the government's ability to bring those actions. Moffitt IV, 875 F. Supp. at 1203-07.

We thus turn to the preemptive effect of the Comprehensive Forfeiture Act.[1] Because the CFA does not contain an express preemption provision, the question is whether it, by implication, overrides state law. The law firm argues, and the district court agreed, that under the principles of implied conflict preemption the government cannot pursue the common law actions of detinue and conversion. Id.[2] We

_____

[1] "The CFA added or amended forfeiture provisions for two classes of violations under federal law, racketeering offenses and CCE offenses, see 98 Stat. 2040-2053, as amended." United States v. Monsanto, 491 U.S. 600, 603 n.1 (1989). In this opinion, we refer to the portion of the CFA that authorizes forfeiture for continuing criminal enterprise (CCE) offenses. See 21 U.S.C. § 853.

[2] Federal preemption under the Supremacy Clause is fundamentally a question of whether a state law "conflicts with Congress' intent (either express or plainly implied) to exclude state regulation." English v. General Electric Co., 496 U.S. 72, 79-80 n.5 (1990). Such an intent can be identified in a number of ways, Freightliner Corp. v. Myrick, 115 S.Ct. 1483, 1487 (1995), but, other than implied conflict preemption, none are relevant here. In particular, there is no "actual conflict" between the CFA and the state claims brought by the government because it would not be "impossible for a private party to comply with both state and federal" law. English, 496 U.S. at 79.

9

believe, however, that common law actions are available to the government in its effort to forfeit the fee.

A.

We start from the premise that federal statutes do not, by implication, abrogate the government's right to bring common law suits. This controlling principle is derived directly from United States v. Texas, 507 U.S. 529 (1993). As in this case, Texas involved a claim that a federal statute extinguished the right of the United States to pursue collection efforts under common law. In Texas , the Supreme Court held that the Debt Collection Act of 1982 did not abrogate the federal government's common law right to recover prejudgment interest against states, even though the Act did not explicitly make such interest recoverable from the states. Id.

The right exercised by the federal government in Texas to bring suit at common law was a long-standing one. The roots of this authority can be traced to the First Judiciary Act of 1789. Act of Sept. 24, 1789, § 9, 1 Stat. 73, 77 (granting federal district court jurisdiction over "all suits at common law where the United States shall sue."). Federal courts currently exercise original jurisdiction over "civil actions, suits, or proceedings" brought by the United States. 28 U.S.C. § 1345. Under this authority, the United States can bring common law actions "claiming in its contractual and proprietary relations the same protection of the general law, at least, that belong[s] to any other legal person." Paul Bator et al., Hart and Wechsler's Federal Courts and the Federal System 911 (3d ed. 1988); see also United States v. San Jacinto Tin Co., 125 U.S. 273, 278-86 (1888); Jessup v. United States, 106 U.S. 147, 152 (1882). As in Texas, the federal government has done nothing more here than exercise an established right to bring common law actions, in this case ones of conversion and detinue. See United States v. Union Livestock Sales Co., 298 F.2d 755 (4th Cir. 1962) (conversion action); United States v. Butt , 203 F.2d 643 (10th Cir. 1953) (same).

The question, then, is whether the CFA somehow abrogated this recognized right on the part of the United States. The CFA, like the Debt Collection Act in Texas, "does not speak directly to the Federal Government's right to" pursue state common law claims against par-

10

ties like Moffitt, Zwerling. Texas, 507 U.S. at 534. Notwithstanding the statutory silence, the Texas Court held the government's common law rights remained intact. The Supreme Court noted that: "'Congress's mere refusal to legislate with respect to the prejudgment-interest obligations of state and local governments falls far short of an expression of legislative intent to supplant the existing common law in that area.'" Id. at 535 (citation omitted). The unmistakable import of Texas, then, is that common law remedies possessed by the United States will not be extinguished by congressional failure to re-affirm their validity.

Texas is not alone in holding that common law actions are available to the government to supplement those remedies found in federal statutes, as long as the statute does not expressly abrogate those rights. This principle has been affirmed and re-affirmed many times. See Wisconsin Central Railroad Co. v. United States , 164 U.S. 190, 210-11 (1896) (common law remedy of offset to recoup monies already paid not abrogated by statutory authorization of fraudulent payment remedy); Cecile Indus., Inc. v. Cheney , 995 F.2d 1052, 1054-56 (Fed. Cir. 1993) (common law remedy of offsetting contract debts against contract payments not abrogated by Debt Collection Act's statutory remedies); United States v. Kearns, 595 F.2d 729, 732-33 (D.C. Cir. 1978) (common law remedy of breach of fiduciary duty not abrogated by bribery and fraud statutes); Continental Management, Inc. v. United States, 527 F.2d 613, 620 (Cl.Ct. 1975) (same); United States v. Mead, 426 F.2d 118, 124-25 (9th Cir. 1970) (common law remedy of payment by mistake not abrogated by False Claims Act's statutory remedies); United States v. Borin, 209 F.2d 145, 148 (5th Cir.) (common law remedy of fraud not abrogated by False Claims Act's statutory remedies), cert. denied, 348 U.S. 821 (1954); United States v. Silliman, 167 F.2d 607, 610-11 (3d Cir.) (common law remedies not abrogated by False Claims Act), cert. denied, 335 U.S. 825 (1948).

Moffitt, Zwerling responds, however, that this case is distinguishable from Texas because the government relies on the federal forfeiture statute to establish certain elements of the common law actions. It is true that to establish its right to possession of the fee, the government relies on the relation back doctrine. That doctrine, codified at 21 U.S.C. § 853(c), retroactively vests title in the United States as of the

11

date of the activity giving rise to the forfeiture. See Caplin & Drysdale, 491 U.S. at 627. The government's reliance on this doctrine, however, to establish one element of a common law cause of action does not remove this case from the reach of Texas. To prohibit the government from availing itself of a statutory right that Congress conferred upon it would arbitrarily restrict the government's ability to pursue its remedies at common law. Just as any party might rely on legal or contractual authority to establish a right to possess a piece of property, the government has the perfect right to point to other provisions of law that confer a right to possession of the fee.

B.

Even accepting the general premise of Texas, however, Moffitt-Zwerling argues that, under this particular statute, the government's common law actions are preempted because they conflict with the objectives of the CFA. For support, the firm points to the "substitute asset" provision of 21 U.S.C. § 853(p). Under that provision, if forfeitable assets are unavailable at the time a forfeiture order is entered, the government has a statutory right to obtain "any other property of the defendant up to the value" of those assets. Id. Section 853(p), however, says nothing about the recovery of substitute assets from third parties (as opposed to defendants) who had reason to know that the fee was subject to forfeiture. This silence, according to the law firm, indicates that one purpose of the CFA is to protect third party transferees who no longer possess property that would otherwise be forfeited. The law firm argues that permitting actions in conversion and detinue would "stand[ ] as an obstacle to the accomplishment of the full purposes and objectives" of the CFA. Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248 (1984).

The firm's argument that the CFA preempts state common law actions by negative implication is faulty on several grounds. To begin with, a court approaches preemption claims "with the basic assumption that Congress did not intend to displace state law." Maryland v. Louisiana, 451 U.S. 725, 746 (1981). This assumption has particular force here because Congress explicitly stated that the federal drug laws do not generally preempt state law. 21 U.S.C. § 903. In fact, federal anti-drug laws override state law only if "there is a positive conflict between [state law and federal law] so that the two cannot

12

consistently stand together." Id. There cannot be such a "positive" conflict when Congress has not seen fit to prohibit the conversion or detinue actions that state common law has permitted.

Far from creating a positive conflict, much less impeding the purposes of the CFA, the state actions pursued by the government promote the aims of the statute. As a general matter, the CFA broadly defines property subject to forfeiture and requires that "any" property derived from or used to facilitate criminal activity "shall" be forfeited upon conviction. 21 U.S.C. § 853(a). Its provisions were specifically designed to ease the government's ability to track down the proceeds of crime. See, e.g., 21 U.S.C. §§ 853(c)-(f), (k). One of the most powerful tools contained in the CFA is the relation back provision, 21 U.S.C. § 853(c), which allows the government to reach forfeitable assets transferred to third parties. Explicitly intended to effectuate the extensive forfeiture scheme by closing a loophole in the existing forfeiture laws, § 853(c) prevents defendants from shielding their assets from forfeiture "simply by transferring an asset to a third party." S. Rep. No. 225, 98th Cong., 2d Sess. 196, reprinted in 1984 U.S.C.C.A.N. 3182, 3379

Congress did not, on the one hand, provide the government with this powerful array of remedies, and then, on the other, deprive it sub silentio of its common law rights of action. To the contrary, the CFA is to be "liberally construed to effectuate its remedial purposes." 21 U.S.C. § 853(o). Those purposes, in a nutshell, are to "give force to the old adage that `crime does not pay.'" Monsanto, 491 U.S. at 614. It is with that precise objective in mind that the government pursued common law actions against Moffitt, Zwerling, a third party transferee that dissipated a legal fee it had cause to know came from criminal activity. The common law claims further, rather than frustrate, what Congress intended to accomplish when it authorized the forfeiture of property derived from drug dealings. Indeed, it would run counter to the aims of the Act to disapprove of these state law actions.

We find Moffitt, Zwerling's arguments to the contrary unconvincing. It is true that the CFA recognizes and protects the interests of third-party transferees. The extent of that protection, however, is spelled out in § 853(n), which prevents the forfeiture of assets held by innocent third parties. The law firm was given the full benefit of this

13

provision, but it failed utterly to demonstrate that it was an innocent transferee. It is also true, as the law firm points out, that only defendants are explicitly named as subject to the substitute assets provision. 21 U.S.C. § 853(p). Naming only defendants, however, was a logical step. The government's need to recover substitute assets will arise far more often in the case of defendants than it will with third-party transferees. No provision of the CFA, however, can be read to provide insulation from common law actions for transferees who hurriedly spent assets they had reason to know were the proceeds of crime. In fact, the substitute assets provision of § 853(p) was enacted to make the government's forfeiture efforts more effective. It would be astonishing if a provision designed by Congress to augment the government's forfeiture remedies were held to abrogate common law actions and thereby restrict the government's forfeiture efforts. See Texas, 507 U.S. at 536-37.

We also are not persuaded by the district court's view that the detinue and conversion actions might conflict with the CFA and are thus preempted. The district court observed that a party may be liable in detinue or conversion even if the transferee had no reason to know that the property was tainted and that holding such a party liable would conflict with the innocent-transferee provision of the CFA. Moffitt IV, 875 F. Supp. at 1205 & n.33. The short answer to this concern is that there is no such conflict in this case because Moffitt, Zwerling was not an innocent transferee under § 853(n). And "[t]he existence of a hypothetical or potential conflict is insufficient to warrant [ ] pre-emption." Rice v. Norman Williams Co., 458 U.S. 654, 659 (1982).

C.

As a final matter, Moffitt, Zwerling appears to rely generally on the comprehensiveness of the CFA to buttress its view that there is no place in forfeiture law for state causes of action. This argument is nothing more than a backdoor way of claiming that Congress intended to occupy the field to the exclusion of state law. English, 496 U.S. at 79. The anti-drug laws, however, explicitly disavow "an intent on the part of the Congress to occupy the field." 21 U.S.C. § 903. Moreover, state law has traditionally been relied upon to resolve questions of property rights and interests arising under the CFA. See United States

14

v. Certain Real Property at 2525 Leroy Lane, 910 F.2d 343, 347-49 (6th Cir. 1990), cert. denied, 499 U.S. 947 (1991). And, of course, the anti-drug laws authorize the federal government to cooperate with state and local governments in efforts aimed at drug trafficking. See 21 U.S.C. § 873. The Attorney General is authorized to assist states in "the institution and prosecution of cases in the courts of the United States and . . . courts of the several States," 21 U.S.C. § 873(a)(2), and in "conducting investigations and prosecutions" of the diversion of legitimate drugs to illegitimate uses, § 873(d)(1)(B). In short, the claim that Congress regulated so pervasively in the field of forfeiture as to make "no room" for state law is groundless. English, 496 U.S. at 79 (citation omitted).

## V.

The government's common law actions of detinue and conversion are thus not preempted by the CFA. We next address whether the government has stated the required elements of a conversion claim.

We affirm the district court's judgment that the government has stated the elements of a conversion action. Conversion is the "wrongful exercise or assumption of authority . . . over another's goods . . ." United Leasing Corp. v. Thrift Ins. Corp., 440 S.E.2d 902, 905 (Va. 1994) (quoting Universal C.I.T. Credit Corp. v. Kaplan, 92 S.E.2d 359, 365 (Va. 1956)); see also McCormick v. AT & T Technologies, Inc., 934 F.2d 531, 535 (4th Cir. 1991), cert. denied, 502 U.S. 1048 (1992). To make out a conversion action in Virginia the government must have had an immediate right to possess the $103,800 at the time it was allegedly wrongfully converted by the law firm. United Leasing, 440 S.E.2d at 906. The key dispute is whether the government had such a right to possession.

Under the relation back doctrine codified in § 853(c), the government had the right to possess the $103,800 at the time the law firm received it in August, 1991. 21 U.S.C. § 853(c). No provision of the CFA suggests that § 853(c) cannot be relied upon to establish one element of a conversion action. Moffitt, Zwerling emphasizes, however, that the government did not actually gain title to the $103,800 until the entry of the forfeiture order. But once the forfeiture order was entered, the government's title dated back in time to the criminal

15

activity giving rise to the forfeiture, a date which necessarily was prior to August, 1991. See United States v. Parcel of Rumson, N.J. Land, 507 U.S. 111, 125-27 (1993). The government therefore had a right to possess the $103,800 in August, 1991.**3**

VI.

We finally address the government's contention that the district court improperly constrained its efforts to uncover property traceable to the $103,800. Such property, if not in the hands of an innocent transferee under § 853(n), is forfeitable under the CFA. See 21 U.S.C. § 853(a)(1) (forfeitable assets include any property derived from criminal proceeds). To "facilitate the identification and location of property declared forfeited," § 853 authorizes district courts to order discovery, including depositions and the production of any "book, paper, document, record, recording, or other material not privileged." 21 U.S.C. § 853(m). The government argues that its effort to conduct discovery under this provision was inappropriately restricted to documents and descriptions provided by the law firm itself. It also argues that the district court erred in not subjecting law firm partner Lisa Kemler to discovery to determine if she held traceable property.

The district court oversaw an extensive discovery effort in this case. In the many rulings issued by the district court, some limits were placed on the government, but the law firm was also required to turn over considerable documentation regarding the disposition of the $103,800. A district court enjoys wide discretion in guiding tracing efforts and entering final forfeiture orders, see 21 U.S.C. §§ 853(g) & (m), and we do not intend to supervise the details of the complex discovery conducted in this case. Moreover, given that the government has the conversion remedy available to it, the district court will be required to weigh in the discovery balance the relative ease of recovery of the forfeitable property under this common law route.

The district court, however, did place two artificial limits on the government's tracing efforts. First, the court cut off all discovery with

_____

**3** In view of our holding on the question of conversion, we need not address the district court's ruling that the government failed to state the elements of its detinue action. See Moffitt IV , 875 F.Supp. at 1198-99.

16

respect to payments by the law firm to corporations owned, in whole or in part, by law firm partners and their spouses. Moffitt III, 875 F. Supp. at 1163. Such corporations, however, could be a natural place for dispersal of the fee and payments to those corporations might result in traceable property. Particularly because the law firm dissipated so much of the fee before the restraining order was entered, the government had to be afforded a reasonable opportunity to follow the trail of the forfeitable property that made its way to corporations and partnerships closely associated with the law firm.

Second, the district court completely barred discovery regarding law firm partner Lisa Kemler because, it found, she was likely to qualify as an innocent transferee under § 853(n). Moffitt III, 875 F. Supp. at 1162; J.A. 1657-59. However, Kemler never filed any § 853(n) petition. It was Kemler's burden to demonstrate that she was an innocent transferee and the district court had already rejected the § 853(n) petition filed on behalf of the law firm as an entity. Kemler participated in Covington's defense, she helped carry the cash payment to the bank for deposit, and she participated in at least one of the initial meetings with prosecutors regarding Covington's case. In this context, cutting off all discovery with respect to her was in error.

VII.

Moffitt, Zwerling has sought throughout this litigation to focus attention on the government's conduct. We understand that situations may arise in which the government abuses the power to seek forfeiture, which is undoubtedly a "powerful weapon[ ] in the war on crime." Caplin & Drysdale, 491 U.S. at 634. We also reiterate that the right to the assistance of counsel in the presentation of one's own defense is among the great liberties that a free people enjoys.

Neither prosecutorial misconduct nor an infringement of the constitutional right to counsel, however, is at issue in this litigation. What this lawsuit has brought to light is troubling conduct of a different kind. The law firm in this case was dealing with a client who already had most of his assets seized as the result of a major drug trafficking investigation. The firm accepted an immense cash payment from the client composed largely of $100 bills and stuffed into a shoe box or a Ritz cracker box. And the firm complied with its client's request not

17

to provide a receipt for fear, the client said, it would fall into the hands of law enforcement authorities. Perhaps most disturbing, the district court disqualified the firm from this case in part because of evidence that the firm tried to dissuade its own client from negotiating with the government because of the unfavorable effect a guilty plea might have on the law firm's fee. Moffitt I, 846 F. Supp. at 467; J.A. 567-68. This conduct disappoints. It falls far short of what America expects from the members of one of its most privileged professions.

For the foregoing reasons, the district court's judgment is affirmed in part, and reversed in part. The case is remanded for further proceedings consistent with this opinion.

SO ORDERED

18