F I L E D
United States Court of Appeals
Tenth Circuit

NOV 2 2004

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 03-5165

TODD HENSHAW,

Defendant-Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. No. 00-CV-236-K)

Submitted on the briefs:

Todd Henshaw, Pro Se.

Eileen J. O'Connor, Assistant Attorney General, Charles Bricken, Attorney, and
Sara Ann Ketchum, Attorney, Tax Division, Department of Justice, Washington,
D.C., for Plaintiff-Appellee.

Before **KELLY** , **HARTZ** , and **TYMKOVICH** , Circuit Judges.

**TYMKOVICH** , Circuit Judge.

Defendant Todd Henshaw appeals from a judgment entered against him in favor of the Government for $20,000 and interest. The district court found that Henshaw, an attorney, had converted the $20,000 by knowingly collecting his fee from proceeds his client had derived from the sale of property encumbered by tax liens. Because the proceeds were commingled with other funds when Henshaw received the $20,000, the resolution of this case turns on the selection of an appropriate equitable method for tracing money that has lost its separate identity. "[A]dherence to specific equitable principles, including rules concerning tracing analysis[, is] subject to the equitable discretion of the court," and our review is limited to an abuse-of-discretion standard. *United States v. Durham*, 86 F.3d 70, 72 (5th Cir. 1996); *see McKinney v. Gannett Co.*, 817 F.2d 659, 670 (10th Cir. 1987) ("[A]pplication of equitable doctrines rests in the sound discretion of the district court; absent a showing of abuse of discretion, the district court's exercise thereof will not be disturbed on appeal."). We hold that the district court did not abuse its discretion in tracing the $20,000 Henshaw received to the encumbered proceeds and, accordingly, affirm the judgment for the Government. [1]

---

[1] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

## Factual and Procedural Background

After a trial to the bench, the district court found the following pertinent facts. Henshaw's client, Robert Lowrance, filed for Chapter 11 bankruptcy and opened a debtor-in-possession account (DIPA). In the course of the proceeding, he was ordered to open a separately-segregated account (SSA), which he did with the same bank, to be the repository of proceeds from court-authorized sales of property subject to federal tax liens. The order prohibited Lowrance from taking any funds out of the SSA both during and after the bankruptcy proceeding without the court's prior approval and notice to the Government. On February 29, 2000, the court orally granted Lowrance's motion to dismiss the bankruptcy proceeding, but with the condition that the dismissal would not affect its order regarding the sale of assets and disposition of SSA funds. A written order memorializing this ruling was entered on March 13, 2000.

By December 1999, however, Henshaw was aware that Lowrance had put SSA funds into the DIPA. Despite knowing that the DIPA was thus tainted by improperly commingled funds, Henshaw asked Lowrance to pay a portion of his fee from the DIPA instead of submitting an application to the bankruptcy court for payment of his fee under 11 U.S.C. § 330. In late February 2000, Lowrance wrote five checks totaling $664,903.24 on his DIPA. The checks were cleared on March 1, 2000, the same day that Lowrance wrote a $700,000 check on the SSA

and deposited the money in the DIPA to cover the withdrawals. One of the five checks was written to the Bank of Oklahoma for a $20,000 cashier's check, and had Henshaw's name in the memo line. Henshaw accepted the cashier's check in payment for his services in the bankruptcy case.

Shortly thereafter, the Government brought this action against Lowrance to reduce certain tax assessments to judgment and to foreclose on its tax liens. The Government later added a claim against Henshaw, alleging that he had converted its property, i.e., proceeds in the SSA that it was entitled to by virtue of its liens, when he accepted the $20,000 from Lowrance. By way of defense, Henshaw argued that there was no direct demonstrable link between any SSA funds and the $20,000 he received from Lowrance and, therefore, he could not have converted the Government's money.

**Equitable Tracing Issues**

Recognizing that commingling of funds in the DIPA made straightforward legal attribution of particular sums impossible, the district court properly turned to equitable tracing principles, which are means "used by courts in many different areas of law to identify and segregate property that has been mingled with other property in such a manner that it has lost its identity." William Stoddard, Note, *Tracing Principles in Revised Article 9 § 9-315(B)(2): A Matter of Careless Drafting, or an Invitation to Creative Lawyering*, 3 Nev. L.J. 135, 135 (Fall

2002).  "[T]he goal of 'tracing' is not to trace anything at all in many cases, but rather [to] serve[] as an equitable substitute for the impossibility of specific identification."  *Id.* at 142.  There are several alternative methods, none of which is optimal for all commingling cases; courts exercise case-specific judgment to select the method best suited to achieve a fair and equitable result on the facts before them.  *Id.* at 139-40, 149.

The district court chose the "last in-first out" (LIFO) method that relates deposits and withdrawals based on temporal contiguity.  The court deemed this an appropriate approach given the obvious relationship in time and amount between the deposit from the SSA and the series of checks, including the $20,000 for Henshaw, written on the DIPA.  We agree; "LIFO is an accepted accounting method and its use was appropriate here."  *United States v. Intercontinental Indus., Inc.*, 635 F.2d 1215, 1220 (6 th Cir. 1980).

Henshaw argues, unpersuasively, that equities weigh against the use of any tracing method, such as LIFO, that would favor the Government's position here. He insists that both parties bear responsibility for failing to respond earlier to Lowrance's misconduct and asserts that, between the two, the Government should bear the loss.  We cannot agree.  The Government may have been in a position at some point to discover and object to Lowrance's misuse of the SSA and DIPA, but Henshaw–Lowrance's  *attorney* –was in a position to do something about it

from the outset. Instead, as Henshaw admits, he left Lowrance to police himself, without professional legal or accounting oversight. Further, after Henshaw knew that the DIPA had been tainted with commingled SSA funds, he nevertheless sought and secured the direct payment of his fee out of the account, an expedient that bypassed proper bankruptcy code procedure. Henshaw insists that he was not aware of the specific $700,000 SSA-to-DIPA transfer when he obtained his fee, but this merely attenuates the degree of impropriety involved (he admits he knew of prior instances of Lowrance commingling SSA and DIPA funds).

Henshaw argues that it is inconsistent for the Government to invoke LIFO tracing to tie his fee to the $700,000 deposit from the SSA, when that tracing method would not work to tie the fee to other instances of commingling that had occurred, which could only be reached, rather, by use of a "lowest intermediate balance" (LIB) method. Even conceding Henshaw's point about the contrasting reach of the LIFO and LIB methods, it does not show that inconsistent tracing methods have actually been used. All it shows is that the Government had alternative approaches available to it for addressing the tracing question here, each better suited to a different source of funds commingled in the DIPA, and the one it chose to pursue was properly used by the district court to tie Henshaw's fee to the immediately preceding deposits from the SSA. There is no evidence in the

-6-

record demonstrating any instance in which the Government actually employed a different accounting method in this case to trace money in the DIPA to the SSA.

Henshaw also attempts to invoke the notion of ratification to undercut the Government's effort to reclaim its property. Specifically, Henshaw asserts that the Government ignored earlier instances when Lowrance used tainted DIPA funds to pay other obligations during the bankruptcy proceeding and contends that it thereby "ratified" the subsequent use of commingled funds to pay his fee, citing *Davis v. Jones*, 254 F.2d 696, 700 (10 th Cir. 1958). Even assuming the factual premise, this argument clearly fails. *Davis* does not stand for the proposition that tolerance of a prior breach of trust grants some kind of general license to disregard fiduciary duties in the future. On the contrary, *Davis* explains that to ratify a breach of trust, the beneficiary must "hav[e] knowledge of *all the facts,*" *id.* at 700 (emphasis added); *see also* Restatement (Second) of Trusts § 216(2)(b) (1959) (beneficiary's consent is ineffective if not based on knowledge of material facts)–something inherently lacking in the generic, prospective notion of ratification Henshaw seeks to invoke. The Government may have known of some past misuse of funds, but Henshaw does not suggest that it was aware of any of the material facts here, i.e., Lowrance's transfer of $700,000 from the SSA to the DIPA and coincident payment of Henshaw's fee out of the DIPA. And when the Government did learn of these facts, it took legal action to enforce its rights.

**Legal Ownership Issues**

In addition to his equitable arguments, Henshaw advances two contentions challenging Government ownership of the converted funds that are more strictly legal in nature. First, he contends that the cashier's check used to pay his fee constituted the funds of the issuing bank, not Lowrance's, and thus use of the check severed any legal connection to the Government funds Lowrance had withdrawn from the SSA. This disingenuous contention–that the mere purchase of a cashier's check detaches a tax lien from the funds used for the purchase–is plainly belied by the general principle that after a transaction involving property encumbered by a tax lien, "[t]he lien reattaches to the thing *and to whatever is substituted for it*." *Phelps v. United States*, 421 U.S. 330, 334 (1975) (quotation omitted and emphasis added). And the case law contains numerous examples in which cashier's checks are traced back to their sources for various purposes, often to establish criminal liability or forfeiture based on the illegal derivation of the funds used to purchase the check. *See, e.g.*, *United States v. Benjamin*, 252 F.3d 1, 8 (1 st Cir. 2001) (following *United States v. Butler*, 211 F.3d 826, 830 (4 th Cir. 2000)); *United States v. 42.5 Acres*, 834 F. Supp. 912, 920-21 (S.D. Miss. 1992).

Second, Henshaw notes that the deduction for the $700,000 check was not reported on the SSA statement until March 2, 2000, the day after the money was deposited in the DIPA to underwrite the five DIPA checks (including the one used

-8-

to purchase the cashier's check for his fee).  Without elaboration or supporting authority, he concludes from this that the $700,000 from the SSA was not in his account when the cashier's check was purchased and, therefore, the SSA funds had no connection to the payment of his fee.  We disagree.

The parties *stipulated* to the fact that the *$700,000 SSA check* was *deposited in the DIPA* on March 1, 2000, *see* Aplt. App. at 51 (Joint Pretrial Order), and that fact is corroborated by the DIPA monthly statement, which clearly credits the $700,000 SSA check to the account on that date.       *See* Aplt. Addendum at 193 (reflecting $700,000 deposit on March 1) and 194 (specifying March 1 "daily account balance," derived by adding $700,000 to starting balance and then subtracting checks cashed that day).  Henshaw cannot now disavow or circumvent that stipulated, substantiated fact simply by pointing to a day's delay in the notation by the bank (which held both accounts) to record the withdrawal on the SSA statement.  [2]

---

[2]     Even if, contrary to the plain thrust of the stipulation and corroborating bank records, we were to suppose that the $700,000 deposited in the DIPA on March 1 reflected the bank's own funds, provided in exchange for the $700,000 subsequently withdrawn from the SSA, that would just mean that the deposit was "substituted for [SSA funds]" and therefore encumbered with the tax lien tied to those funds, *Phelps* , 421 U.S. at 334 (quotation omitted), on the same analysis set out above in connection with the cashier's check given to Henshaw.

**Availability of Cause of Action for Conversion**

Finally, Henshaw argues that the IRS cannot, in any event, recover its property from him through assertion of a conversion claim. He insists that the sole remedy here is a levy under 26 U.S.C. § 6332, from which he is insulated because, even if the $20,000 he got from Lowrance belonged to the Government, he has spent that money and levies are effective only against a "person *in possession of* " the property subject to the levy. Section 6332(a) (emphasis added). We reject this attempt to use an inapplicable statutory remedy as a shield against an otherwise proper and effective common law remedy.

The Government has a well-established right to bring common law causes of action, including tortious conversion, and in such cases the district courts properly exercise jurisdiction under 28 U.S.C. § 1345. *United States v. Moffitt, Zwerling & Kemler, P.C.*, 83 F.3d 660, 667 (4 th Cir. 1996) (following *United States v. Texas*, 507 U.S. 529 (1993), and citing *United States v. Butt*, 203 F.2d 643 (10 th Cir. 1953), and *United States v. Union Livestock Sales Co.*, 298 F.2d 755 (4 th Cir. 1962), as specific examples of conversion). Henshaw must therefore argue that this right to sue for conversion was abrogated when Congress afforded the IRS the various levying powers set out in § 6332.

"We start from the premise that federal statutes do not, by implication, abrogate the government's right to bring common law suits." *Moffitt, Zwerling &*

-10-

*Kemler, P.C.*, 83 F.3d at 667. In other words, "common law actions are available to the government to supplement those remedies found in federal statutes, as long as the statute does not expressly abrogate those rights." *Id.*; *see id.* at 668 (collecting numerous cases reaffirming principle).

Far from such a situation of express abrogation, here we have statutory and common law remedies that easily complement each other. Under the statute, the Government can demand the surrender of a taxpayer's property found in the hands of a third party, *see* § 6332(a), and can recover the value of the property from the third party if he or she refuses to surrender it, *see* § 6332(d). But given the statute's narrow focus on surrender of the taxpayer's property, it does not apply if the third party "can show that it was not, pursuant to the language in 26 U.S.C. § 6332(a), 'in possession of' any of the delinquent taxpayer's property . . . at the time that it received the notice of levy." *United States v. Ruff*, 99 F.3d 1559, 1563 (11 th Cir. 1996); *see Kane v. Capital Guardian Trust Co.*, 145 F.3d 1218, 1221-22 (10 th Cir. 1998). That, of course, is the remedial gap Henshaw seeks to escape through by having converted and dissipated the funds the Government would otherwise have demanded he surrender under § 6332(a). The conversion claim neatly supplements the statutory remedy by filling this gap with a tort liability that, having its own distinct and fairly onerous elements, neither contravenes nor nullifies the levy procedure.

-11-

Henshaw's convert-and-dissipate defense is evidently fairly novel, as there are few cases explicitly addressing the relationship between conversion claims and § 6332(a) levies. There appear to be two primary district court decisions. In *Nomellini Construction Co. v. United States*, 328 F. Supp. 1281 (E.D. Cal. 1971), the court analyzed the question in abrogation terms similar to those discussed above, and concluded, as do we, that "[t]he statutory and common law remedies redress different evils" and "that the creation of one narrow remedy [in § 6332] was [not] meant to eradicate all other established [common law] forms of relief." *Id.* at 1285-86. [3] In *Fritschler, Pellino, Schrank & Rosen, S.C. v. United States*, 716 F. Supp. 1157 (E.D. Wis. 1988), the court took an opposing view, holding that "[c]onversion is outside the scope of section 6332, and would require the court to create or imply a remedy that Congress could have created had it been of a mind to do so." *Id.* at 1161. But this stands the analysis on its head; the question is not whether Congress expressly or impliedly created a conversion remedy in conjunction with § 6332, but whether it abrogated the Government's traditional right to invoke existing common law conversion remedies in passing § 6332. In our view, *Nomellini* asked and correctly answered the right question.

---

[3] *Nomellini* was more recently followed in an unpublished decision issued by another federal district court in California. *See United States v. Smyers*, No. CV 98-2603 MMM(MCX), 1998 WL 681461, at *8 (C.D. Cal. Aug. 24, 1998).

Accordingly, we hold that the Government was not precluded from asserting a claim for tortious conversion in this case.

The judgment of the district court is AFFIRMED.