UNITED STATES of America

v.

Dianne M. MATTA–TIMMINS.

No. Crim.A. 99–10116–PBS.

United States District Court,
D. Massachusetts.

Jan. 3, 2000.

John J. Thornton, Quincy, MA, for Dianne M. Matta–Timmins, defendant.

Victor A. Wild, United States Attorney's Office, Boston, MA, Richard L. Hoffman, United States Attorney's Office, Boston, MA.

## GOVERNMENT'S MOTION TO DISQUALIFY DEFENSE COUNSEL

SARIS, District Judge.

### I. *INTRODUCTION*

The government moved to disqualify defense counsel, John J. Thornton, Esq., claiming that he has a direct conflict of interest with his client, the defendant,

Dianne Matta–Timmins. After a non-evidentiary hearing, the government's motion is **DENIED.**

## II. BACKGROUND

On April 1, 1999, Matta–Timmins was indicted for bank fraud, in violation of 18 U.S.C. § 1344, embezzlement by a bank officer or employee, in violation of 18 U.S.C. § 656, and money laundering, in violation of 18 U.S.C. §§ 1956 and 1957. The indictment also seeks forfeiture pursuant to 18 U.S.C. § 982(a)(2)(A) and (a)(1). The charges stem from acts that were allegedly done while defendant worked as a service representative at Shawmut Bank, and its successor Fleet Bank between 1994 and 1997. Matta–Timmins retained Thornton to represent her as a result of a bank investigation by corporate representatives of Fleet Bank in 1997. On October 11, 1997, defendant entered into a fee and escrow agreement to set up a "Sixth Amendment Criminal Defense Fund" pursuant to 18 U.S.C. § 1957(f)(1). To pay her legal expenses, on the same day, Matta–Timmins refinanced two real properties located in Dedham, Massachusetts and on November 13, 1997, she deposited $159,212.98 in an escrow account controlled by Thornton. The fund was also used to pay the properties' mortgages ($61,057.48) and to pay for maintenance, insurance and upkeep.

On December 24, 1997, the government filed a civil complaint pursuant to 18 U.S.C. § 981(a)(1)(A) and (C)[1] seeking forfeiture of the two Dedham properties that the defendant allegedly purchased with the proceeds of her criminal acts. An affidavit of FBI Special Agent Arnold P. Bernhard is attached to the complaint. With Thornton's assistance, Matta–Timmins filed a verified claim in response to the civil forfeiture action pursuant to Supplemental Rule C(6) in which she swore she purchased the property from funds from legitimate sources amounting to $267,920.00.

Many of the mortgage and maintenance payments were made after the filing of the civil forfeiture complaint.

On March 24, 1998, Assistant U.S. Attorneys ("AUSA") Hoffman and Wild (according to AUSA Wild's affidavit) informed Thornton that they believed his deposit of the funds into his escrow fund could create a conflict of interest because they were allegedly embezzled funds or traceable assets. The AUSA's pointed out to Thornton that the use of these funds could be the basis for additional charges against defendant, and that Thornton could be called as a witness against his client. Numerous payments were made from the escrow account after this notification.

On April 1, 1999, defendant was indicted. The following day, this Court entered a restraining order prohibiting further disbursement of the escrowed funds. There were no more funds in the escrow account at the time the restraining order was issued.

AUSAs Hoffman and Wild filed affidavits detailing their subsequent conversations with Thornton. They assert that Thornton told them: that he knew he was in jeopardy of criminal charges for making the mortgage payments; that Matta–Timmins threatened to refer him to the Board of Bar Overseers ("BBO") if he didn't release the funds to her; that Matta–Timmins demanded he return her passport; and that he took funds from the account as a fee. Thornton vehemently denies making these statements.

On May 4, 1999, the government filed a motion to disqualify Thornton arguing that he has a substantial conflict of interest with his client. The government believes the conflict arises from the threatened BBO referral, Thornton's own potential criminal liability, and the possibility that Thornton may be called as a witness against Matta–Timmins.

---

1. *See United States v. the Real Properties Known as 144 Crane Street, Dedham and 11* *Continent Place, Dedham,* Civ. Action No. 97–1280–EFH.

The government later claimed that Thornton violated the April 2, 1999 restraining order that prohibited further withdrawals from the escrow account. This claim was based on an appendix to one of Thornton's briefs that listed two July 1, 1999 disbursements totaling $15,135.14 for legal fees and costs. Subsequently, Thornton submitted documents showing that they were actually a periodic accounting against a previously withdrawn flat fee. While the government's concern was well-founded, the Court is satisfied that the restraining order has not been violated. The other concerns were not so easily dispelled.

At the defendant's request, the Court appointed Martin Richey, Esq., an Assistant Federal Defender, to meet independently with Matta–Timmins to advise her of the ramifications of the government's claims. After consultation with Richey, and after hearing, Matta–Timmins waived any potential conflict, stating that, even if the government's claims are true, she wishes to be represented by Mr. Thornton. I find that the waiver is knowing, intelligent, and voluntary.

## III. *DISCUSSION*

The Sixth Amendment guarantees a criminal defendant the right to the assistance of counsel in a trial for a serious crime. *See Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). "[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States,* 486 U.S. 153, 158–59, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). The Sixth Amendment "presumption in favor of counsel of choice" is limited by the court's "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 160, 108 S.Ct. 1692.

■ Professional standards require: "A lawyer shall not represent a client if representation of that client may be materially limited ... by the lawyer's own interests, unless: (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after consultation." Mass. S.J.C.R. 3:07, R. of Prof'l Conduct 1.7(b). Where the government has reason to believe that the defense counsel has a direct conflict with his client, the government must alert the court. *See United States v. Levy,* 25 F.3d 146, 152 (2d Cir.1994). Defense attorneys have a similar obligation. *See United States v. Soldevila–Lopez,* 17 F.3d 480, 487 (1st Cir.1994).

■ If an issue of actual or potential conflict arises, the court is duty bound to inquire into the circumstances and determine whether the defendant can receive a fair trial with effective assistance of counsel. *See United States v. Santiago–Lugo,* 167 F.3d 81, 84 (1st Cir.1999). A waiver by the defendant of the conflict is not a panacea. *See Wheat,* 486 U.S. at 161–162, 108 S.Ct. 1692. Where a court justifiably finds an actual conflict of interest, or a serious potential for conflict, it may decline a proffer of waiver. *See id.*

Although conflicts of interest generally arise in the context of joint representation, they can also arise when the client's interest conflicts with the lawyer's interest. *See United States v. Ellison,* 798 F.2d 1102, 1106–07 (7th Cir.1986) (finding a conflict where counsel was forced to testify against his client concerning allegations which, if true, would be tantamount to malpractice). Such is the case when a vigorous defense might bring forward the attorney's own criminal liability. *See United States v. Saccoccia,* 58 F.3d 754, 772 (1st Cir.1995) ("[A] few courts have found a per se Sixth Amendment violation 'where trial counsel was implicated in the

crime for which his client is on trial.' But these cases tend to involve circumstances in which a vigorous defense of the client might unearth proof of the attorney's criminality.") (quoting *Soldevila–Lopez*, 17 F.3d at 490) (citations omitted); *United States v. Cancilla*, 725 F.2d 867, 870 (2d Cir.1984) ("[I]t must have occurred to counsel that a vigorous defense might uncover evidence or prompt testimony revealing his own crimes. . . .").

The disqualification of defense counsel must be a measure of last resort. *See United States v. Diozzi*, 807 F.2d 10, 12–13 (1st Cir.1986) (finding disqualification improper because the government could have introduced defense counsel's testimony by way of stipulation). The government bears a heavy burden to establish that disqualification is justified. *See id.*

The government claims that there is a serious potential for conflict between Thornton and Matta–Timmins because: 1) Thornton may be called as a witness against Matta–Timmins; 2) Thornton may be criminally or civilly liable; and 3) Matta–Timmins and Thornton's attorney-client relationship has broken down. In this murky pre-trial stage, it is difficult to separate the *Wheat* from the chaff in these allegations.

The government's first two claims center around Thornton's handling of the escrow account. The defendant refinanced two parcels of allegedly forfeitable real estate and placed the funds into an escrow account with Attorney Thornton. After the civil forfeiture action was filed, Thornton released funds to be used as mortgage, maintenance, and insurance payments on the forfeitable properties and withdrew

money as payment of his own fee. So far, counsel has been paid $52,738.84 for his legal services. The government asserts that these actions make Thornton a potential witness against the defendant in connection with the money laundering charge. Although Thornton may have some relevant information relating to the funds, there is little need for him to testify because his actions are undisputed. In fact, Thornton submitted a detailed summary of these payments as an exhibit to this motion and agreed to stipulate to these facts. Should the government want to introduce evidence relating to the disbursements, it can do so by either stipulation or documentary evidence. *See* Mass. S.J.C.R. 3:07, R. of Prof'l Conduct 3.8(f).[2]

The government also makes the troubling argument that Thornton's use of the escrow funds may subject him to criminal charges for money laundering. The present record suggests that the likelihood of civil or criminal liability of defense counsel is overstated, but not non-existent. If the escrow funds are found to be forfeitable assets because they are ill-gotten gains, funds taken as attorney fees for pre-indictment legal services may be subject to civil forfeiture proceedings. *See Caplin & Drysdale Chartered v. U.S.*, 491 U.S. 617, 109 S.Ct. 2646, 2652, 105 L.Ed.2d 528 (1989) (stating that a robbery suspect has no right to use funds stolen from a bank to retain an attorney because "[a] defendant has no Sixth Amendment right to spend another's money for services rendered by an attorney"); *In re Moffitt, Zwerling & Kemler*, 846 F.Supp. 463, 477–78 (E.D.Va. 1994) (ordering criminal forfeiture of attorney's fees paid with cash proceeds from

---

2. U.S. District Court Local Rule 83.6(4)(B), incorporates Rule 3.8, which states:
   The prosecutor in a criminal case shall:
   . . .
   (f) not subpoena a lawyer in a grand jury or other criminal proceeding to present evidence about a past or present client unless:
   (1) the prosecutor reasonably believes:
   (i) the information sought is not protected from disclosure by any applicable privilege;

(ii) the evidence sought is essential to the successful prosecution of an ongoing investigation or prosecution; and
   (iii) there is no other feasible alternative to obtain the information; and
   (2) the prosecutor obtains prior judicial approval after an opportunity for an adversarial proceeding. . . .

drug trafficking and holding that a law firm was not a bona fide purchaser because it knew that the fee was paid with drug proceeds).

The government asserts that Thornton placed himself in criminal jeopardy by accepting the escrowed funds as a legal fee and also by making mortgage and other payments on Matta–Timmins's Dedham properties. Section 1957 punishes, by up to ten years imprisonment, anyone who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. § 1957(a). The term "monetary transaction" does not include any "transaction necessary to preserve a person's right to representation as guaranteed by the sixth amendment to the Constitution." *Id.* § 1957(f)(1); *see United States v. Rutgard,* 116 F.3d 1270, 1291 (9th Cir.1997) (stating that the exemption prevents a "drug dealer's check to his lawyer" from being a "new federal felony"). There is no reported case discussing the scope of this exemption. Does it apply before Sixth Amendment rights attach, for example in the pre-indictment stage? *See Davis v. United States,* 512 U.S. 452, 456–57, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) ("The Sixth Amendment right to counsel attaches only at the initiation of adversary criminal proceedings and before proceedings are initiated a suspect in a criminal investigation has no constitutional right to counsel.") (citation omitted). These uncertainties make this exemption a trap for the unwary defense attorney.

Even if the exemption were to be narrowly construed to exclude his pre-indictment activities on the civil forfeiture action, the possibility of Thornton being criminally liable for accepting attorney's fees or making the mortgage payments is low. The central element of § 1957 is that a person *"knowingly* engage[d] in a monetary transaction in criminally derived property." 18 U.S.C. § 1957(a) (emphasis added); *see United States v. Miller,* 78 F.3d 507, 511 (11th Cir.1996) (finding that, in the prosecution of a criminal defense attorney under § 1957, the statute requires the defendant knew that the funds were criminally derived property). Understanding the sensitive nature of prosecutions of defense counsel, Department of Justice policy prohibits the prosecution of criminal defense attorneys for the receipt of bona fide fees unless:

> (1) there is proof beyond a reasonable doubt that the attorney had actual knowledge of the illegal origin of the specific property received (prosecution is not permitted if the only proof of knowledge is evidence of willful blindness); and

> (2) such evidence does not consist of (a) confidential communications made by the client preliminary to and with regard to undertaking representation in the criminal matter; or (b) confidential communications made during the course of representation and in furtherance of the obligation to effectively represent the client.

3 U.S. Dep't of Justice, Department of Justice Manual 9–105.600 (2d ed.2000).

■ Here, the difficulty of proving that Thornton had actual subjective knowledge that the source of the funds was illicit is high. He represented to the Court by way of a sworn affidavit that he believed the properties Matta–Timmins used to fund the escrow account were purchased with gifts from two of Matta–Timmins's ex-husbands, unrelated civil settlements, and proceeds from the sale of her travel agency. (Thornton Aff. at 5.) This belief is grounded in a verified claim by the defendant filed in the civil forfeiture action. True, Thornton had information in December, 1997 from the civil forfeiture action and from the AUSAs in March, 1998 that the funds might be derived from forfeitable assets. However, he also had sworn information from his client to the contrary. While the government's concern about Thornton's use of the escrow funds for non-legal costs is not frivolous, the Court

has no information that the attorney did not act in good faith. This is a far cry from the boxes of cash supplied by a known drug trafficker. *See In re Moffitt, Zwerling & Kemler,* 846 F.Supp. at 477. After hearing, and a review of the submissions, the Court is satisfied that the potential for a conflict is sufficiently remote that Thornton's representation of defendant would not "be hampered by a realistic foreboding that vigorous advocacy would uncover evidence of his own crimes." *Saccoccia,* 58 F.3d at 772.

Finally, the government claims a breakdown in the relationship between Thornton and Matta–Timmins. This claim is based on statements Thornton supposedly made to AUSAs Wild and Hoffman relating to his dealings with Matta–Timmins and her threatened BBO referral. Thornton steadfastly denies making these statements and purports to have a good relationship with his client. Rather than holding a lengthy evidentiary hearing, all counsel agreed that this dispute could be resolved by asking defendant whether she was content with being represented by counsel even after reading the government's submissions. The Court need not engage in an elaborate fact findings to assess the state of their relationship. *See Santiago–Lugo,* 167 F.3d at 84 ("[A]lthough a district court must inquire when advised of a potential conflict, the court may rely on counsel's representations that no such conflict exists.").

▮ In cases such as this, where there is no actual conflict and the threat of potential conflict is not serious, a defendant can opt to proceed with chosen counsel by waiving any potential conflict. *See United States v. Melo,* 702 F.Supp. 939, 942 (D.Mass.1988). But, the waiver is only effective if it is made knowingly and voluntarily. *See id.* For the purposes of this motion, Matta–Timmins met with separate counsel, Martin Richey, Esq., of the office of the Federal Defender, who advised her of the possible implications of being represented by Thornton. After consultation,

she forcefully informed the Court that even if the government's factual assertions are true, she wants to continue to be represented by Thornton. The Court is satisfied that her waiver was made knowingly and with full knowledge of the implications of her decision.

I have two residual concerns which I flag. My biggest concern arises from the apparent acrimony among counsel, which may interfere with an effective trial of the case or possible plea negotiations. Essentially, counsel have accused each other of lying. All counsel have assured me that as professionals, they can rise above this personal animus. The defendant was informed of this concern and chooses to proceed with counsel. I accept her waiver on this point as well.

Second, I am concerned about the possibility that a conflict might arise if Matta–Timmins decided to plead guilty to money laundering counts, thereby subjecting Thornton's attorney's fee to civil or criminal forfeiture. *See In re Moffitt, Zwerling & Kemler,* 846 F.Supp. at 467 (disqualifying defense counsel who persuaded the defendant not to plead guilty because doing so would reflect poorly on counsel's firm after the government obtained a court order restraining the law firm from disbursing the fees because of possible forfeiture). In *Caplin & Drysdale,* the Supreme Court recognized this possibility of a conflict in plea bargaining: "[A] lawyer may advise a client to accept an agreement entailing a more harsh prison sentence, but no forfeiture—even where contrary to the client's interests—in an effort to preserve the lawyer's fee." 491 U.S. at 633 n. 10, 109 S.Ct. 2646. The Court concluded that any such conflict could be remedied by an ineffective assistance of counsel claim. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). While there is a potential for a conflict at the plea bargaining stage, that potential conflict is too remote at this point in time to require disqualification. If, as the case unfolds, a substantial conflict of

interest becomes apparent, the Court can take appropriate steps.

## IV.  *ORDER*

The government's motion to disqualify Thornton (see Docket # 13) is **DENIED.**